**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Steve Alan Boggs, | No. CV-14-02165-PHX-GMS |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| v. | **ORDER** |
| David Shinn, et al., | |
| Respondents. | |

Before the Court is the Petition for Writ of Habeas Corpus filed by Steve Alan Boggs, an Arizona death row inmate. (Doc. 48.) Respondents filed an answer and Boggs filed a reply. (Docs. 21, 26.) For the reasons set forth below, and based on the Court's review of the briefings and the entire record herein, the petition is denied.

## I.      BACKGROUND

In 2002, Boggs and Christopher Hargrave robbed a fast food restaurant and shot three employees to death. In 2005, Boggs was found guilty of three counts of first-degree murder, among other counts, and sentenced to death. The following facts are taken from the opinion of the Arizona Supreme Court upholding the convictions and sentences. *State v. Boggs*, 218 Ariz. 325, 185 P.3d 111 (2008).

On May 19, 2002, police officers responded to a 911 call from a Jack in the Box restaurant in Mesa. The first officer to arrive found one of the restaurant's employees, Beatriz Alvarado, lying on the ground outside the back door. She repeatedly asked for help before dying from two gunshot wounds to her back. Inside the restaurant, officers found

the body of another employee, Fausto Jimenez, next to a telephone. Jimenez had been shot three times in the back but managed to dial 911 shortly before dying from his wounds. In the freezer was the body of a third employee, Kenneth Brown, who had died from two gunshot wounds. Police found shell casings and bullets in the freezer. Two cash registers were opened and contained only coins. A third register appeared as if someone had tried to pry it open. Jimenez and Brown were missing their wallets.

The next night, Hargrave, a friend of Boggs's who had recently been fired from the restaurant, tried to use Jimenez's bank card at an ATM.

Two days after the murders, Boggs traded in a Taurus handgun at a pawnshop. Police recovered the weapon and determined that it had fired all of the shell casings and bullet fragments found at the scene, including fragments found in the victims' bodies.

During interviews with Detective Donald Vogel, Boggs "confessed to playing an active role in the robbery and admitted shooting at the victims." *Boggs*, 218 Ariz. at 331, 185 P.3d at 117. He described the murders in detail, explaining that "the victims were forced at gunpoint to lie down in the work area of the restaurant, ordered to remove everything from their pockets, ordered to march through the cooler into the back freezer with their hands interlaced on top of their heads, forced to kneel down, and then shot in rapid succession." *Id.* at 341, 185 P.3d at 127. Boggs also told police that after they left the victims in the freezer, he and Hargrave heard screaming, "at which point he returned to the freezer and shot some more." *Id.*

Boggs and Hargrave were involved in a white supremacist "militia" they called the Imperial Royal Guard. They and their girlfriends were the only members. In a letter to a Detective Vogel, written after his confession, Boggs explained that his motive for the murders was racial rather than pecuniary.

Prior to trial, Boggs waived his right to counsel and represented himself. He relinquished his right to self-representation after several days of jury selection, and his advisory counsel took over his defense. Boggs moved to resume self-representation

between the aggravation and penalty phases of trial, but the court denied his request. The jury found Boggs guilty of all charged crimes.

At sentencing, the jury found three aggravating factors for each of the murders: expectation of pecuniary gain, under A.R.S. § 13–703(F)(5); the murders were committed in an especially heinous, cruel or depraved manner, under § 13–703(F)(6); and a conviction for one or more other homicides during the commission of the offense, under § 13–703(F)(8).[1] The defense presented mitigation evidence concerning Boggs's troubled childhood and mental health issues. At the close of the trial, the jury found that Boggs's mitigation was not sufficiently substantial to call for leniency and concluded that death was the appropriate sentence for each murder.

The Arizona Supreme Court affirmed the convictions and sentences. *Boggs*, 218 Ariz. 325, 185 P.3d 111. After unsuccessfully pursuing post-conviction relief ("PCR"), Boggs filed a petition for writ of habeas corpus in this Court. (Doc. 15.) The Court previously granted in part and denied in part Boggs's motion for evidentiary development. (Doc. 67.) The Court also denied Claims 1, 2, 4 (in part), 7, 8, 12(A), 15 (in part), 17, 18, 22, 24, 26, 28, 30, 40, and 43. (*Id.*)

## II.    APPLICABLE LAW

### A.    AEDPA

Federal habeas claims are analyzed under the framework of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Pursuant to the AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d).

---

[1] At the time of Boggs's offense, Arizona's capital sentencing scheme was set forth in A.R.S. §§ 13–703 and 13–703.01 to –703.04. It is presently set forth in A.R.S. §§ 13–751 to –759. The Court refers throughout this order to the statutes in effect at the time Boggs committed the murders.

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams (Terry) v. Taylor*, 529 U.S. 362, 410 (2000) (O'Conner, J., concurring). Under § 2254(d), "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The burden is on the petitioner to show "there was no reasonable basis for the state court to deny relief." *Id.* at 98.

A petitioner may challenge a state court's factual findings by attempting to show that the "findings were not supported by substantial evidence in the state court record" or by demonstrating that the fact-finding process was "deficient in some material way." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). To succeed on federal habeas review, however, the petitioner must demonstrate "that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), *abrogated on other grounds by Murray (Robert) v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014).

In *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), the Court reiterated that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *See Murray*, 745 F.3d at 998 ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1).").

For claims not adjudicated on the merits in state court, federal review is generally not available when the claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In Arizona, there are two avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3).

For unexhausted and defaulted claims, "federal habeas review . . . is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. *Coleman* further held that ineffective assistance of counsel in PCR proceedings did not establish cause for the procedural default of a claim. *Id.*

In *Martinez v. Ryan*, 566 U.S. 1, 9 (2012), however, the Court established a "narrow exception" to the rule announced in *Coleman*. Under *Martinez*, a petitioner may establish cause for the procedural default of an ineffective assistance of trial counsel claim "by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984)' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 14); *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019). "*Strickland*, in turn, requires [a petitioner] to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015). The Ninth Circuit has explained that, "The reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Clabourne*, 745 F.3d at 377; *see also Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective.").

*Martinez* applies only to claims of ineffective assistance of trial counsel; it has not been expanded to other types of claims. *See Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (denying petitioner's argument that *Martinez* permitted the resuscitation of a procedurally defaulted *Brady* claim, holding that only the Supreme Court could expand the application of *Martinez* to other areas); *see also Davila v. Davis*, 137 S. Ct. 2058, 2062–63 (2017) (explaining that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

## III. ANALYSIS

Boggs raises 43 claims in his 450-page habeas petition. These include both exhausted claims and unexhausted claims.

### A.      Unexhausted Claims

Of the remaining claims in Boggs's petition, the following are procedurally defaulted because Boggs failed to raise them in state court, or failed to raise them in a procedurally appropriate manner: Claims 9, 10, 11, 13, 23, 37, 38, 39, 41, and 42. Their default is not excused by the ineffective assistance of appellate or PCR counsel.

In Claim 9, Boggs alleges that his rights were violated by the admission of "excessively gruesome photographs." (Doc. 15 at 57.) In Claim 10, he alleges that the trial court gave improper guilt-phase jury instructions. (*Id.* at 164.) In Claim 11, he alleges that his due process rights were violated because the trial court's failure to hold a pretrial hearing on the State's intent to introduce other act evidence related to his white supremacist militia led to admission of the evidence without meeting the requirements of Rule 404(b). (*Id.* at 166.) In Claim 13, he alleges that the trial court erred in instructing the jury on the multiple-homicides aggravating circumstance. (*Id.* at 211.) In Claim 23, he alleges that the AEDPA is unconstitutional. (*Id.* at 375.) In Claim 37, he alleges that his rights were violated by the trial court's failure to provide a special verdict form. (*Id.* at 418.) In Claim 38, he alleges that Arizona's capital sentencing scheme violates the Sixth, Eighth, and

Fourteenth Amendments because it does not require the prosecution to prove that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. (*Id.* at 420.) In Claim 39, he alleges that he was deprived of his constitutional right to a reliable capital sentencing proceeding. (*Id.* at 421.) In Claim 41, he alleges that his execution after more than ten years on death row violates the Eighth and Fourteenth Amendments. (*Id.* at 433.) Finally, in Claim 42, he alleges that he will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments. (*Id.* at 436.)

Boggs did not present these claims on direct appeal. (*See* Doc. 21-1, Ex. A.) He argues, however, that the ineffective assistance of appellate or PCR counsel provides cause for the default and establishes prejudice. These arguments fail.

First, before ineffective assistance of appellate counsel may be used as cause to excuse a procedural default, the particular ineffective assistance allegation must first be exhausted in state court as an independent claim. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (explaining that "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"); *Murray v. Carrier*, 477 U.S. 478, 489–90 (1986); *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988). During the PCR proceedings, Boggs did not allege ineffective assistance of appellate counsel based on counsel's failure to raise these claims. (*See* ROA-PCR 54.)[2] Therefore, ineffective assistance of appellate counsel cannot constitute cause for their default. Boggs does not attempt to demonstrate that a fundamental miscarriage of justice will occur if the claims are not resolved on the merits.

Next, the alleged ineffectiveness of PCR counsel does not excuse the default under *Martinez*, which, as described above, applies only to defaulted claims of ineffective assistance of trial counsel. Unlike allegations of ineffective assistance of trial counsel, these claims could have been raised on direct appeal. Therefore, they are not subject to the "limited qualification to *Coleman*" established in *Martinez*. Boggs asserts that the equitable

---

[2] "ROA-PCR" refers to the record on appeal from post-conviction proceedings prepared for Boggs's petition for review to the Arizona Supreme Court (Case No. CR-14-0074-PC).

principles of *Martinez* should apply to other types of claims, but cites no authority for that argument, and the case law holds the opposite. *See Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27. Accordingly, these claims remain procedurally barred. Claims 9, 10, 11, 13, 23, 37, 38, 39, 41, and 42 are denied.[3]

## B. Exhausted Claims

The following claims were denied on the merits by the Arizona Supreme Court: Claims 3–6, 15, 19, 25, 27, 29, and 31–36. Therefore, this Court's analysis takes place under the provisions of 28 U.S.C. § 2254(d).

### Claim 3

Boggs alleges that the Arizona courts violated his Sixth, Eighth, and Fourteenth Amendment rights by denying his motion to represent himself at the penalty phase of trial. (Doc. 15 at 73.) The claim was denied on direct appeal. *Boggs*, 218 Ariz. at 338, 185 P.3d at 124.

Facts

Prior to trial, Boggs waived his right to counsel and moved to represent himself. (RT 6/18/04 at 6–7.) Following a series of evaluations of Boggs's mental health, the trial court granted the motion. (RT 9/3/04 at 5.)

After seven months of representing himself, Boggs relinquished his right to self-representation on the fifth day of jury selection:

---

[3] In addition being defaulted and barred from federal review, Claim 23 is plainly meritless. *See Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (holding that AEDPA violates neither the Suspension Clause nor separation of powers); *Evans v. Thompson*, 518 F.3d 1, 3 (1st Cir. 2008). Claim 41 is meritless because the United States Supreme Court has never held that lengthy incarceration prior to execution constitutes cruel and unusual punishment. *See Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not been addressed); *Thompson v. McNeil*, 556 U.S. 1114 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of certiorari; Thomas, J., concurring, discussing *Lackey* issue). Finally, Claim 42 is not cognizable on federal habeas review. Habeas relief can only be granted on claims that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Boggs's challenge to state clemency procedures and proceedings does not represent an attack on his detention and thus does not constitute a proper ground for relief. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir.1989) (per curiam); *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir.1997) (per curiam).

THE DEFENDANT: Your Honor, at this time I have taken the Court's recommendation under consideration and as well as Mr. Alcantar's and the rest of the defense staff, and at this time I find no reason to revoke.

THE COURT: Okay. Well, we are not going to play games during the trial, but I have told you before that this is a bad idea and that what you are doing is a mistake, and that you're going to find as you get into the case you're going to say and do things that are going to make you look foolish and be bad for you.

Our law allows you to do that and so we are going to go ahead and proceed.

If you decide that you want to change your mind at some time during the trial, then we can talk again.

. . .

MR. CARR: Before we go any further, you misheard Mr. Boggs, I think.

THE DEFENDANT: I think I said invoke instead of revoke.

THE COURT: What is it? You want to represent yourself?

THE DEFENDANT: No, I would like to relinquish control back to Mr. Alcantar.

THE COURT: Okay. Very good. And the lack of clarity of your last statement is eloquent evidence of the wisdom of your choice.

(RT 4/11/05 at 5–6.)

After the jury returned guilty verdicts on all counts, Boggs filed a motion seeking to represent himself again. The trial court denied the motion:

THE COURT: . . . Mr. Boggs, I indicated to you earlier, we're not going to play ping-pong on this. You've indicated that you wanted Mr. Alcantar and Mr. Carr to represent you during the trial. I think that was a wise move. I do not think it would be a wise move to change.

And more importantly, the law indicates that this is not something that we can—we can't be changing horses mid-stream here. So I'm going to go ahead and deny your motion.

1    (RT 5/5/05 at 11.)

2    <u>Analysis</u>

3       The Arizona Supreme Court rejected Boggs's argument that "the trial court abused

4 its discretion by denying his motion to proceed pro per at the penalty phase." *Boggs*, 218

5 Ariz. at 338, 185 P.3d at 124. The court first noted that, "The right to proceed without

6 counsel is not unqualified, but must be balanced against the government's right to a fair

7 trial conducted in a judicious, orderly fashion." *Id.* (internal quotations omitted). The court

8 then explained:

> A defendant who exercises the right to self-representation can subsequently waive that right, either explicitly or implicitly. *See, e.g., McKaskle v. Wiggins*, 465 U.S. 168, 182 (1984). In this case, Boggs relinquished his right to proceed pro per on April 11, 2005, despite the trial judge's warning that "if [advisory counsel] take over the trial, they are going to take over the trial." The judge further cautioned, "[W]e are not going [to] go back and forth on this."
>
> When a defendant has waived his right to self-representation, the trial court may exercise its discretion in deciding whether to permit or deny a subsequent attempt to proceed pro per. *See United States v. Singleton*, 107 F.3d 1091, 1099 (4th Cir. 1997) (stating that if a defendant has waived the right to self-representation, "[t]he decision at that point whether to allow the defendant to proceed *pro se* at all or to impose reasonable conditions on self-representation rests in the sound discretion of the trial court"). The nature of the right to self-representation does not "suggest [ ] that the usual deference to 'judgment calls' ... by the trial judge should not obtain here." *McKaskle*, 465 U.S. at 177 n.8; *see also State v. Cornell*, 179 Ariz. 314, 326, 878 P.2d 1352, 1364 (1994) (recognizing that self-representation is not an absolute right and stating that "the court need not stop the trial for the convenience of the defendant each time he changes his mind").
>
> Before Boggs decided to relinquish his right of self-representation, the trial judge cautioned that if Boggs wished to have appointed counsel take over his representation, counsel would remain in that position for the remainder of the trial. When Boggs relinquished his right to self-representation and thereby waived his right to proceed pro per, the judge again gave a similar warning. When the trial court denied Boggs' second motion to represent himself, it reminded Boggs of its previous warnings and stated that it would not go back and forth on the issue. Because Boggs had relinquished the right

to self-representation, the trial judge did not abuse his discretion in denying Boggs' second request to represent himself.

*Id.*

This decision is neither contrary to nor an unreasonable application of clearly established federal law, nor is it based on an unreasonable determination of the facts.

While the Supreme Court recognizes a constitutional right to self-representation in criminal proceedings, *Faretta v. California*, 422 U.S. 806, 832 (1975), the right is "not absolute." *Martinez v. Court of Appeal of California, Fourth Appellate Dist.*, 528 U.S. 152, 161–62 (2000). "[T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Id.* For example, a judge "may . . . terminate self-representation or appoint 'standby counsel'— even over the defendant's objection—if necessary." *Id.*

"Boggs' claim fails because he fails to identify . . . any Supreme Court decision holding that when a defendant has already invoked and waived the right to self-representation during the proceedings, a court violates the defendant's *Faretta* rights by denying a subsequent motion for self-representation made in the middle of trial." (Doc. 21 at 43–44.) Given the circumstances of this case, the decision of the Arizona Supreme Court does not satisfy 28 U.S.C. § 2254(d).

*Faretta* incorporated a timing element into its discussion of the right to self-representation, stating that the right would be violated if the court denied a request made "weeks before trial." 422 U.S. at 835–36. However, "[b]ecause the Supreme Court has not clearly established when a *Faretta* request is untimely, other courts are free to do so as long as their standards comport with the Supreme Court's holding that a request 'weeks before trial' is timely." *Marshall v. Taylor*, 395 F.3d 1058, 1061 (9th Cir. 2005). The Ninth Circuit has noted that "[t]he Supreme Court has never held that *Faretta's* 'weeks before trial' standard requires courts to grant requests for self-representation coming on the eve of trial." *Stenson v. Lambert*, 504 F.3d 873, 884 (9th Cir. 2007).

Boggs's request to re-invoke his right to self-representation was made *during* his trial. The trial court had already put Boggs on notice that once he relinquished his right to self-representation, he would be represented by counsel through the remainder of the trial. These circumstances support the trial court's exercise of its discretion not to allow Boggs to change his status yet again. *See Singleton*, 107 F.3d at 1099; *see also United States v. Frazier-El*, 204 F.3d 553, 559 (4th Cir. 2000) ("In ambiguous situations created by a defendant's vacillation or manipulation, we must ascribe a 'constitutional primacy' to the right to counsel because this right serves both the individual and collective good, as opposed to only the individual interests served by protecting the right of self-representation.").

Given the timing of Boggs's request to proceed *pro per*, and the fact that he had already once relinquished that right, fairminded jurists could disagree on the correctness of the Arizona Supreme Court's denial of this claim. *Richter*, 562 U.S. at 101; *see Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented," the state court did not unreasonably apply clearly established federal law). Claim 3 is denied.

**Claim 4**

Boggs alleges multiple constitutional violations arising from the admission of his videotaped interviews with the police. (Doc. 15 at 80.) Specifically, he alleges that his statements were obtained in violation of his right to counsel; that the admission of Hargrave's statements violated his right of confrontation; that the admission of Detective Vogel's statements accusing Boggs of lying and referring to other evidence violated his due process rights; and that statements made to Vogel after Boggs said "just leave me alone" and mentioned committing suicide were involuntary. The Arizona Supreme Court denied these claims on direct appeal. *Boggs*, 218 Ariz. at 332–36, 185 P.3d at 118–22.

<u>Additional facts</u>

Boggs was taken into custody and questioned twice, on June 5 and 6, 2002. (RT 4/14/05 at 98, 112; Trial Exhibits 281.001, 278, 279, 280 (June 5th interview tapes), 277 (transcript), 269, 270 (June 6th interview tapes), 275 (transcript).) On June 5, 2002, after

being advised of his *Miranda* rights, Boggs agreed to speak with Detective Donald Vogel of the Mesa Police Department. (Exhibit 277 at 1–2.) During the approximately three-hour interview, Boggs gave several stories regarding his involvement in the murders at the Jack in the Box. (*Id.* at 106–07.) At first, he admitted dropping Hargrave off at the Jack in the Box for work but denied any knowledge of the murders. (*Id.* at 8–20.) Boggs then stated that Hargrave told him that he had taken the three employees into the back of the restaurant and shot them execution style. (*Id.* at 23–24.) Boggs continued to deny that he went into the restaurant and denied knowing that Hargrave had Boggs's gun. (*Id.* at 28.) He next stated that Hargrave told him that he wanted to go to the Jack in the Box to scare the employees. (*Id.* at 64–65.) Later, Boggs repeated that Hargrave told him he had robbed the restaurant and shot three employees. (*Id.* at 69–70.)

Finally, Boggs admitted that he saw what had happened inside the restaurant. (*Id.* at 95.) Boggs stated that he watched Hargrave take the employees to the freezer, force them to face the wall, and shoot each one in the back. (*Id.* at 96–100.) Boggs stated that Hargrave threatened him with the gun and told him to check the victims' pockets and take their wallets. (*Id.* at 95–96, 119.)

The next day, June 6, while being processed at the Mesa Jail, Boggs asked Detective Dominick Kaufman "what detective he needed to speak to to change his story." (RT 4/12/05 at 181.) After his initial appearance in East Mesa Justice Court, Boggs again asked Detective Kaufman and Detective Dana Price who he needed to speak with to change his story. (*Id.* at 184–85, 189.) Detective Price told Boggs that he would need to talk to Detective Vogel and called Vogel to make arrangements for the second interview. (*Id.* at 189–90.)

During the second interview, Detective Vogel clarified with Boggs that he had requested to speak with Vogel again. (Trial Exhibit 275 at 1–2.) Detective Vogel again administered the *Miranda* advisory and Boggs agreed to speak with him. (Trial Exhibit 275 at 2.) Boggs started the interview by claiming that he had lied in his statement the day before. (*Id.* at 3.) He again denied entering the restaurant and witnessing Hargrave shoot the employees. (*Id.* at 3–9.)

In reply, Detective Vogel told Boggs that Hargrave had accused Boggs of shooting all the victims. (*Id.* at 9, 10, 25.) Boggs continued to deny that he was involved in the shootings. (*Id.* at 25–32.)

During a brief break in the questioning, Boggs asked Detective Vogel, "is there like a way I can make a deal with the DA." (*Id.* at 41.) Vogel replied that Boggs would have opportunities to speak with the prosecutor. (*Id.*)

Boggs proceeded to admit that he and Hargrave planned to rob the Jack in the Box; according to Hargrave, the restaurant kept as much as $14,000 in large bills in a box to which Hargrave had access. (*Id.* at 43–44.) Boggs maintained, however, that during the robbery he had acted only as a look-out and did not enter the restaurant. (*Id.* at 51.)

Detective Vogel continued to challenge Boggs's truthfulness. Boggs maintained his innocence with respect to the murders. At one point, Detective Vogel mentioned Boggs's son. Boggs told Detective Vogel to leave him alone. (*Id.* at 71.) Detective Vogel offered to leave the room but Boggs did not reply. (*Id.*) Boggs threatened to kill himself. (*Id.*) He then suggested that he would be willing to provide more information if he could speak to the DA and get an agreement in writing. (*Id.* at 72–73.)

Ultimately, Boggs admitted that he participated in the murders. He told Detective Vogel that he went into the Jack in the Box with Hargrave and that the victims were taken into the cooler because he and Hargrave were worried about noise from the gunshots. (*Id.* at 76–77.) Boggs admitted to shooting at the victims after Hargrave had shot them, aiming at one victim and firing multiple shots. (*Id.* at 76–80.)

At a voluntariness hearing on April 4, 2005, Boggs, representing himself, argued that his confessions should be suppressed because they were involuntary and resulted from duress; because he was taken from his vehicle and immediately interrogated; and because he invoked his right to counsel at the time of his initial arrest, prior to the June 5 interrogation. (RT 4/4/05 at 28–29.) Boggs argued that coercion and the overbearing of his will compelled him to speak to the detective during the interrogations. (*Id.* at 28.) After the hearing, the trial court found that the videotape and transcript of the June 6 interrogation

were admissible because Boggs received a *Miranda* warning and initiated the second interrogation. (*Id.* at 108.)

Claim 4(A):   Right to counsel

Boggs argues that because the June 6 interview occurred after he had been appointed counsel, his statements in that interview were obtained in violation of his Sixth Amendment rights. (Doc. 15 at 88–95.) The Arizona Supreme Court rejected this argument. *Boggs*, 218 Ariz. at 332–33, 185 P.3d at 118–19.

> Boggs asserted his Sixth Amendment right to counsel at the June 6 initial appearance. Subsequently, however, Boggs asked several times to speak with someone to change the story he had told Detective Vogel during the previous day's interrogation. Importantly, after Boggs asserted his right to counsel at the initial appearance, Boggs asked Detective Kaufman with whom he could speak to change his story and told Detective Vogel that he wanted to speak with him. Finally, at the beginning of the June 6 interrogation, Detective Vogel asked Boggs a series of questions to clarify that Boggs, rather than the detectives, initiated the conversation. Vogel again read Boggs his *Miranda* rights, and Boggs agreed to voluntarily answer Vogel's questions. Boggs thus initiated the communication with the police, and Detective Vogel was not barred from conducting further interrogation.
>
> Boggs argues that although he initiated contact by asking to change his story, the June 6 interview nonetheless violated his right to counsel. He cites *State v. Hackman*, 189 Ariz. 505, 507–08, 943 P.2d 865, 867–68 (App.1997), for the proposition that once counsel is appointed, counsel must be present for an accused to validly waive his Sixth Amendment rights. But *Hackman*, unlike this case, involved contact initiated by the state's investigator rather than by the accused. *Id.* at 506, 943 P.2d at 866. Boggs also relies on a New York case which again involved a police-initiated interview. *See People v. Arthur*, 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537, 537–38 (1968). We decline to hold that an accused cannot waive the right to counsel unless counsel is present when the accused himself initiates contact with the police. We find no violation of Boggs' Sixth Amendment rights.

*Id.* This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court held that an accused who invokes the right to counsel "is not subject to further interrogation by the authorities

until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85. Such "initiation" will be found when the suspect utters words or engages in conduct that can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983). After a suspect initiates this dialogue, the police may begin to question him if he knowingly and intelligently waives his right to counsel. *Id.* at 1044–46.

There is no doubt that Boggs re-initiated contact with the detectives by asking to speak with a detective to change his story. Therefore, the Arizona Supreme Court reasonably concluded that there was no violation of *Edwards*. *See Edwards*, 451 U.S. at 484–85; *Mickey v. Ayers*, 606 F.3d 1223, 1235 (9th Cir. 2010) (citing *Bradshaw*, 462 U.S. at 1045).

Boggs relies on *Michigan v. Jackson*, 475 U.S. 625 (1986), *overruled by Montejo v. Louisiana*, 556 U.S. 778 (2009), but *Jackson* is inapposite. There, the Court held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 475 U.S. at 636. Boggs, not the police, initiated the interrogation. *See Patterson v. Illinois*, 487 U.S. 285, 291 (1988) (explaining that a defendant may waive his Sixth Amendment right to counsel and speak to police without counsel present); *see also Michigan v. Harvey*, 494 U.S. 344, 352–53 (1990) (holding that even after the right to counsel has attached, the decision to waive that right need not itself be counseled).

Boggs also contends that his waiver was not knowing and intelligent, arguing that his mental illness rendered him incompetent to waive his right to counsel. (Doc. 15 at 92.) This aspect of his claim is unexhausted. Because it is not a claim of ineffective assistance of trial counsel, its default is not excused under *Martinez*. The allegation that Boggs was incompetent is also without merit, as the Court explained in its order on evidentiary development. (Doc. 67 at 19.)

Also without merit is Boggs's assertion that the Arizona Supreme Court unreasonably determined the facts by finding that Boggs initiated the June 6 interview without "an understanding of how Boggs's serious mental illness may have come into play." (Doc. 15 at 94.) Boggs does not identify which specific facts about his alleged mental illness the court failed to recognize. More significantly, there is no evidence suggesting that Boggs's alleged mental illness undermined the court's conclusion that Boggs initiated the June 6 discussion. Claim 4(A) is denied.

Claim 4(B): Right to confrontation

Boggs alleges that his confrontation rights were violated by the admission of the June 6 interview, in which Detective Vogel told Boggs that Hargrave had implicated him in the murders. (Doc. 15 at 95–102.)

In the June 5 interview, Boggs admitted that he was inside the Jack in the Box with Hargrave when the victims were murdered, watching Hargrave shoot the victims and taking items from them. (Trial Exhibit 277 at 95–104.) During the June 6 interview, Boggs told Detective Vogel that he had lied during the previous interview. (Trial Exhibit 275 at 3, 9.) Boggs began his second interview by telling Detective Vogel that he was not inside the Jack in the Box the night of the murders and simply dropped Hargrave off at the restaurant. (*Id.* at 4–9.) Detective Vogel responded that, "Chris [Hargrave] told me that you did all the shootin' inside the store" and "I'm just tellin' ya' that Chris told me that you were the one that went in the back cooler with everybody . . . and that you did all the shootin'." (*Id.* at 9; *see id.* at 10, 45.)

At trial, Detective Vogel testified that in the June 6 interview he had more information about the murders than he had the day before, including information he had "received from Hargraves [sic], as well as from the officers that contacted Hargraves [sic] and different information and observations that they had." (RT 4/25/05 at 64.) On cross-examination, he agreed that lying to a suspect during an interview was an investigative technique. (*Id.* at 34.)

- 17 -

The Arizona Supreme Court rejected Boggs's argument that his Confrontation Clause rights were violated. *Boggs*, 218 Ariz. at 333–34, 185 P.3d at 119–20. Because Boggs did not object at trial, the review took place under the fundamental error standard.

> The Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause attaches to "testimonial witness statements made to a government officer to establish some fact." *State v. Roque,* 213 Ariz. 193, 214 ¶ 70, 141 P.3d 368, 389 (2006). The right is not violated, however, "by use of a statement to prove something other than the truth of the matter asserted." *State v. Smith,* 215 Ariz. 221, 229 ¶ 26, 159 P.3d 531, 539 (2007); *see also Roque,* 213 Ariz. at 214 ¶ 70, 141 P.3d at 389.

> In *Roque,* we addressed a similar situation that involved a trial court's admission of a videotaped interview in which a detective repeated statements allegedly made by a non-testifying witness against the defendant. 213 Ariz. at 213–14 ¶ 69, 141 P.3d at 388–89. There, we recognized the use of such statements as a valid interrogation technique and found no Confrontation Clause violation because the statements were used merely as a method of interrogation and the jury was instructed that the statements could not be used to establish the truth of the matters asserted. *Id.* at 214 ¶ 70, 141 P.3d at 389.

> Boggs attempts to distinguish his case from *Roque,* in which the prosecution did not present any evidence to establish the truth of the out-of-court statements repeated by the detective. *Id.* Here, Boggs argues, Detective Vogel suggested the truthfulness of Hargrave's statements when he testified at trial that he "had more information with which to confront Mr. Boggs" at the June 6 interview, including information from Hargrave. On the other hand, the State did not present the jury with any direct testimony as to the truthfulness of the statements, did not seek to introduce a transcript of Hargrave's interrogation into evidence, and did not rely on the statements as substantive evidence. Furthermore, on cross-examination, Detective Vogel testified that lying is a permissible interrogation technique.

> Had Boggs objected at trial, he might well have been entitled to an instruction that the statements attributed to Hargrave were introduced as part of the interrogation and could not be used to prove the truth of the matters asserted. But because the statements were admissible at least for the limited purpose of showing the context of the interrogation, Boggs cannot demonstrate fundamental error.

*Id.* This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that a non-testifying declarant's "testimonial" hearsay statements cannot be introduced against a defendant in a criminal case. 541 U.S. at 68. However, the right to confrontation "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

The Arizona Supreme Court concluded that there was no Confrontation Clause violation because Hargrave's alleged statements were not offered for their truth but were introduced as part of the overall interrogation. The court noted that the State did not introduce any testimony that Hargrave actually made the statements, did not seek to introduce a video or transcript of Hargrave's police interview, and never brought attention to the statements or argued that they established Boggs's guilt. Detective Vogel himself testified that lying to a suspect can be used as a technique to elicit a confession. In light of these circumstances, the Arizona Supreme Court reasonably found that the Hargrave statements did not constitute testimonial hearsay and were not admitted for their truth.

Because the statements attributed to Hargrave were not testimonial hearsay, Boggs's reliance on *Bruton v. United States*, 391 U.S. 123 (1968), is also unavailing. *See Lucero v. Holland*, 902 F.3d 979, 987–88 (9th Cir. 2018) ("[T]he *Bruton* limitation on the introduction of codefendants' out-of-court statements is necessarily subject to *Crawford*'s holding that the Confrontation Clause is concerned only with testimonial out-of-court statements.").

Finally, even if there were a Confrontation Clause violation, Boggs would not be entitled to habeas relief. Violations of the Confrontation Clause are subject to harmless-error analysis. *Winzer v. Hall*, 494 F.3d 1192, 1201 (9th Cir. 2007) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), and *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991)). If the error did not result in "actual prejudice," the petitioner is not entitled to relief. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). "Actual prejudice" is demonstrated if the error

in question had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623; *see Bains v. Cambra*, 204 F.3d 964, 977–78 (9th Cir. 2000).

The June 6 video was introduced as evidence of Boggs's incriminating statements, which the jury would have heard even if Hargrave's alleged statements had been redacted. In the video, Boggs admitted that he planned the robbery with Hargrave, entered the Jack in the Box with Hargrave, took the victims into the cooler to muffle the sound of gunshots, and shot at the victims. (Trial Exhibit 275 at 43–44, 76–80.) Because the jury would have heard this evidence even if Hargrave's statements had been omitted from the video and transcript, Boggs cannot show prejudice under *Brecht*.

Claim 4(B) is denied.

Claim 4(C): Admission of Vogel's statements attacking Boggs's truthfulness

Boggs alleges that the state courts violated his due process rights by admitting Detective Vogel's assertions during the interviews that Boggs was lying. (Doc. 15 at 103–07.)

During the interrogations, Detective Vogel confronted Boggs with the various inconsistent versions he offered of his involvement in the murders and accused Boggs of lying. (Trial Exhibit 277, at 15–19, 22, 26–28, 33, 38–39, 41, 51, 53–55, 62–63, 74–75, 94; Trial Exhibit 275 at 49, 54–56, 64, 67, 69–70, 73.) When the video and transcripts of the interviews were admitted, the State had not redacted the portions where Detective Vogel told Boggs he did not believe Boggs was being truthful. (*Id.*) Boggs did not object and did not request a limiting instruction explaining that the statements could not be used to prove that Boggs was lying. (*Id.*)

The Arizona Supreme Court rejected Boggs's argument that his fair trial rights were violated. *Boggs*, 218 Ariz. at 334–35, 185 P.3d at 120–21. The court explained:

> Because Vogel's accusations were part of an interrogation technique and were not made for the purpose of giving opinion testimony at trial, we find no fundamental error. Decisions from other states buttress our conclusion. *See State v. Cordova*, 137 Idaho 635, 51 P.3d 449, 455 (Ct.App.2002) (allowing such statements by interrogating officers at trial "to the extent that

they provide context to a relevant answer by the suspect"); *Lanham v. Commonwealth,* 171 S.W.3d 14, 27–28 (Ky.2005); *State v. O'Brien,* 857 S.W.2d 212, 221–22 (Mo.1993); *State v. Demery,* 144 Wash.2d 753, 30 P.3d 1278, 1284 (2001) (plurality opinion); *see also Dubria v. Smith,* 224 F.3d 995, 1001 (9th Cir.2000) (concluding, in the context of reviewing a denial of habeas corpus, that an officer's statements simply gave context to the defendant's answers). *But see State v. Elnicki*, 279 Kan. 47, 105 P.3d 1222, 1229 (2005) (holding that an officer's statements in a videotaped interrogation are inadmissible opinion evidence and noting that "context" for a defendant's shifting stories could be shown in other ways); *Commonwealth v. Kitchen*, 730 A.2d 513, 521 (Pa. Super. Ct. 1999) (analogizing an interviewer's statements regarding a defendant's truthfulness to a prosecutor's inadmissible personal opinion as to the defendant's guilt).

*Lanham,* one of the most recent cases to address this issue, noted that "[a]lmost all of the courts that have considered the issue recognize that this form of questioning is a legitimate, effective interrogation tool. And because such comments are such an integral part of the interrogation, several courts have noted that they provide a necessary context for the defendant's responses." *Lanham,* 171 S.W.3d at 27. The court concluded that "such recorded statements by the police during an interrogation are a legitimate, even ordinary, interrogation technique, especially when a suspect's story shifts and changes." *Id.* The court also stated that because the statements are not admissible to prove that the suspect was lying, courts should provide the jury with a limiting instruction if one is requested. *Id.* at 27.

We agree that, if Boggs had requested a limiting instruction, one would have been appropriate, but Boggs neither objected to the evidence nor requested a limiting instruction. In addition, Boggs cannot establish prejudice because he did, in fact, provide multiple stories about his involvement; the jury did not need Vogel's comments to know that Boggs lied. Boggs has not established fundamental error.

*Id.* This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

Review of a habeas claim based upon the improper admission of evidence is guided by the principle that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The issue for the federal habeas court "is whether the state proceedings satisfied due process." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting *Jammal*

*v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991)).

The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," *Dowling v. United States*, 493 U.S. 342, 352 (1990), and "has made very few rulings regarding the admission of evidence as a violation of due process." *Holley*, 568 F.3d at 1101. To establish a constitutional violation based on the improper admission of such evidence, Boggs must show that the trial court's error had a "substantial and injurious" effect on the jury's verdict. *Brecht*, 507 U.S. at 638.

The Arizona Supreme Court reasonably concluded that the admission of Vogel's remarks during the interviews did not violate Boggs's due process rights. Detective Vogel's accusations were part of an interrogation technique, provided necessary context for Boggs's responses, and were not made for the purpose of giving opinion testimony at trial. The State did not seek Detective Vogel's testimony about Boggs's truthfulness. His statements that Boggs was being untruthful were made to place Boggs's answers in context given that his story changed numerous times and he admittedly lied in his previous statement.

In *Dubria v. Smith*, 224 F.3d 995, 1001–02 (9th Cir. 2000), the Ninth Circuit held that the admission of an unredacted tape and transcript from a petitioner's police interview did not warrant federal habeas corpus relief on due process grounds.[4] During the interview, the detectives challenged the petitioner about his explanation of events and repeatedly told him that no judge or jury would believe him if he stuck to his story. *Id.* The petitioner claimed that certain portions of the tape and transcript should have been redacted because one of the detectives made comments and asked questions indicating disbelief in the petitioner's story, opinions about the petitioner's guilt, police theories about the victim's death, and references to the petitioner's involvement in the crime. *Id.* at 1001. The Ninth

---

[4] In contrast to Boggs's case, the trial judge in *Dubria* provided limiting instructions telling the jury that it was not to consider the detective's statements for the truth of the matter asserted. *Id.* at 1002. However, the *Dubria* court did not rely on the limiting instructions as the basis for its holding. Instead, after concluding that there was no error, the court stated that "even if" it was error to admit the tapes and transcripts without redacting the detective's accusatory statements, any error was cured by the limiting instructions. *Id.*

- 22 -

Circuit found that "the tape and transcript show . . . an 'unremarkable interview.'" *Id.* The court noted that the questions and comments by the detective placed the petitioner's answers in context, much like a prosecutor's questions at trial. *Id.* Nothing in the detectives' statements "suggested evidence or theories of the case that were not presented at trial." *Id.* Finally, the court found that the comments "were not the types of statements that carry any special aura of reliability [with the jury]." *Id.* at 1002.

As the Arizona Supreme Court found, the same factors apply to the tape and transcript of Boggs's interview. Detective Vogel's comments challenging Boggs's truthfulness were an ordinary interview technique and provided a context for Boggs's admittedly inconsistent versions of the crimes.

Finally, the Court agrees with Respondents that even if admission of the unredacted tape violated due process, Boggs has failed to prove prejudice. The State did not rely on Detective Vogel's remarks to prove Boggs's guilt or to show that he lied. Instead, the State admitted the interviews to introduce Boggs's incriminatory statements, which the jury would have heard whether or not Detective Vogel's comments about Boggs's honesty were redacted. Moreover, given Boggs's "multiple stories about his involvement[,] the jury did not need Vogel's comments to know that Boggs lied." *Boggs*, 218 Ariz. at 335, 185 P.3d at 121. Boggs has failed to show prejudice. *Brecht*, 507 U.S. at 638.

Claim 4(C) is denied.

Claim 4(D): Voluntariness

Boggs alleges that his due process rights were violated by the admission of the statements he made in the June 6 interview after he told Detective Vogel to "leave me alone" and made reference to committing suicide because those statements were involuntary. (Doc. 15 at 107–11.)

Boggs initiated the June 6 interview by requesting to speak with Detective Vogel. He was given *Miranda* warnings and stated that he understood his rights and wanted to talk. (Trial Exhibit 275 at 2.) The interview lasted approximately one and a half hours. Boggs was given several breaks. (*Id.* at 42, 70; RT 4/4/05 at 101.) He was offered food and

drink. Detective Vogel did not threaten Boggs or promise anything in exchange for his statements. (RT 4/4/05 at 101–02; RT 4/14/05 at 110; Trial Exhibit 275 at 1, 3.)

At one point during the interview, shortly after a break, Boggs said, "just leave me alone," in response to a discussion about Boggs's son. Boggs also suggested that he should commit suicide. (Trial Exhibit 275 at 70–72.) Detective Vogel offered to leave the interview room. (*Id.*) In response, Boggs stated, "Guys are going to kill me anyway. So you guys might as well, might as well just get it over with now." (*Id.*) Detective Vogel again asked Boggs if he wanted him to leave the room. (*Id.*) Boggs did not respond. (*Id.*)

The Arizona Supreme Court rejected Boggs's argument that his statements following this exchange were not voluntary. *Boggs*, 218 Ariz. 335–36, 185 P.3d at 121–22.

> Only voluntary statements made to law enforcement officials are admissible at trial. A defendant's statement is presumed involuntary until the state meets its burden of proving that the statement was freely and voluntarily made and was not the product of coercion. *State v. Arnett*, 119 Ariz. 38, 42, 579 P.2d 542, 546 (1978). The state meets its burden "when the officer testifies that the confession was obtained without threat, coercion or promises of immunity or a lesser penalty." *State v. Jerousek*, 121 Ariz. 420, 424, 590 P.2d 1366, 1370 (1979). In determining whether a confession is voluntary, we consider whether the defendant's will was overcome under the totality of the circumstances. To find a confession involuntary, we must find both coercive police behavior and a causal relation between the coercive behavior and the defendant's overborne will. *Colorado v. Connelly*, 479 U.S. 157, 165–66, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In this case, the court did not abuse its discretion in ruling the statements voluntary.
>
> Boggs alleges that Vogel employed psychological pressure to provoke his confession by preying on his love for his son. He analogizes this case to *United States v. Tingle*, 658 F.2d 1332 (9th Cir.1981), which held that police statements were patently coercive because they implied that a mother might not see her child for a long time unless she cooperated with police. *Id.* at 1336.
>
> Any analogy to *Tingle* is strained. Unlike the agents in *Tingle*, Detective Vogel did not threaten Boggs with the loss of his child. Rather, Vogel attempted to solicit a sense of responsibility for his son to encourage Boggs to "tell the truth," not to intimate that Boggs would never see his son if he did not cooperate. When Boggs was unresponsive to Vogel's question

regarding his son's name, Vogel responded, "[Y]ou don't have to talk about the boy," and changed the subject. In fact, although Boggs brought up his son later in the conversation, Vogel refrained from further conversation regarding Boggs' son. Also, Boggs did not confess in direct response to Vogel's comments about his son, demonstrating that these comments did not overcome his will.

Although his argument is not clear, Boggs also seems to argue that the statements must be excluded because Vogel coerced him when he did not cease questioning after Boggs stated, "Just leave me alone." *Miranda* requires that when an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473–74, 86 S.Ct. 1602. If the alleged assertion of the right to silence is ambiguous, or "susceptible to more than one interpretation, the limit of permissible continuing interrogation immediately after the assertion would be for the sole purpose of ascertaining whether the defendant intended to invoke his right to silence." *State v. Finehout*, 136 Ariz. 226, 229, 665 P.2d 570, 573 (1983); *see State v. Flower*, 161 Ariz. 283, 287, 778 P.2d 1179, 1183 (1989) ("[B]y failing to at least clarify [the defendant's] intent, [the detective] did not 'scrupulously honor' [the defendant's] right to silence, and the entire statement was inadmissible as a violation of *Miranda*.").

When Boggs stated, "Just leave me alone," Vogel did not ignore the statement, but instead offered to leave him alone by asking, "Do you want me to walk out for a few minutes?" and stating, "If you want me to leave the room, tell me." These comments attempted to clarify whether Boggs wanted Vogel to end the interrogation or merely to stop discussing his son. Instead of responding in the affirmative, Boggs stated that the police were going to kill him anyway and they "might as well just get it over with now." Boggs then continued talking with Vogel. Vogel did not engage in coercive behavior by clarifying the meaning of Boggs' statements and responding to Boggs' further comments.

Under the totality of the circumstances, Boggs' statements were voluntary. Vogel neither threatened Boggs nor made him any promises. Indeed, Vogel made clear to Boggs that he could not make any promises and was only looking for the truth. Boggs presented no evidence of coercive behavior.

*Id.* (citations omitted).

This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

"An involuntary statement by a defendant violates the Due Process Clause of the Fifth Amendment." *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993) (citing *Connelly*, 479 U.S. at 163). The question is whether, under the totality of the circumstances, the defendant's will was overborne when he confessed. *Id.* at 1031; *see Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause. . . ." *Connelly*, 479 U.S. at 167. To determine whether a confession was voluntary, courts consider the length, location, and continuity of the interrogation; the suspect's maturity, education, and physical and mental condition; and whether the suspect was advised of his *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993). "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Connelly*, 479 U.S. at 170 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)); *see Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010); *Ortiz*, 671 F.3d at 872 ("[I]n the absence of threats or promises, mere psychological appeals to a petitioner's conscience were not enough to overcome his or her will.").

The Arizona Supreme Court reasonably concluded that Boggs's June 6 statements were voluntary and uncoerced. Boggs initiated the interview. Detective Vogel read Boggs his *Miranda* rights and Boggs agreed to speak with him. Boggs was offered food and drink and received multiple breaks during the hour-and-a-half interview. He was not threatened or promised anything in exchange for his statement. These circumstances stand in stark contrast to those where courts have found coercion. *See, e.g.*, *Fulminante*, 499 U.S. at 287–88 (finding that officer's promise to protect defendant from credible threat of violence rendered confession involuntary); *Mincey v. Arizona*, 437 U.S. 385, 398–99 (1978) (finding confession involuntary where defendant had been seriously wounded a few hours earlier, was "depressed almost to the point of a coma," was in intensive care unit, complained of "unbearable" pain, gave incoherent answers, declined to answer questions without a lawyer, and was questioned while lying in a hospital bed).

Any psychological pressure applied by Detective Vogel fell short of the type that has been found to overbear a suspect's will. *See, e.g.*, *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (finding statement involuntary where suspect confessed after officers told her that failure to cooperate would result in her losing financial aid for, and custody of, her children); *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) (explaining that it is impermissible to "deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation'"). Here, Detective Vogel never threatened Boggs's loved ones or demanded his cooperation as a condition of seeing them again.

Boggs cites *Henry v. Kernan*, 197 F.3d 1021 (9th Cir. 1999), but *Henry* is readily distinguishable. There, the court found that the confession was coerced and involuntary where the interrogation continued for an hour after the defendant had invoked his right to counsel, the police knew *Miranda* had been violated and intentionally continued with the interrogation, and they misled the defendant by telling him that what he said could not be used against him for any purpose. *Id.* at 1027–28. During the interview, the defendant was "shaken, confused, and frightened, crying in parts and frequently asking for forgiveness." *Id.* at 1027. His statements were "rambling, disjointed, often unresponsive to the questions asked by the officers, occasionally inaudible, and sometimes virtually incoherent." *Id.* In contrast to the circumstances in *Henry*, Boggs received a *Miranda* warning and agreed to speak with Detective Vogel. Vogel did not mislead Boggs, and Boggs's responses during the interview, while sometimes emotional, were responsive and coherent.

Boggs argues that his "persistent crying, threats of suicide, and multiple requests to be left alone" are evidence that his statements were involuntary. (Doc. 15 at 110.) Viewed in the totality of the circumstances, this behavior does not show Boggs's will was overborne. He continued to speak with Detective Vogel despite Vogel's offer to leave him alone. (Trial Exhibit 275 at 71.) Also, as Respondents note, Boggs attempted to condition his cooperation with Detective Vogel on receiving something in writing from the prosecutor. (*Id.* at 72–73.) It is clear from this statement that Boggs was exercising his will

1  during the interrogation, making a conscious decision whether and under what conditions
2  to confess. Boggs's will was not overborne and his statements were voluntarily given.

3  Claim 4(D) is denied.

4  Conclusion

5  The Arizona Supreme Court's denial of these claims was neither contrary to nor an
6  unreasonable application of clearly established federal law, nor was it based on an
7  unreasonable determination of the facts. Boggs has not met his burden of showing "there
8  was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. Claim
9  4 is denied.

10  **Claim 5**

11  Boggs alleges that the admission of statements Beatriz Alvarado made before she
12  died violated his Sixth Amendment confrontation rights and his rights under the Eighth and
13  Fourteenth Amendments. (Doc. 15 at 111–17.) Only the Confrontation Clause aspect of
14  this claim is exhausted.[5]

15  Luis Vargas testified at trial that he went to the Jack in the Box on the night of the
16  murders and saw a woman "moaning on the ground" behind the building. (RT 4/11/05 at
17  71–72.) The woman (Alvarado) said in Spanish, a language in which Vargas was
18  proficient, "they were robbing," "they were still robbing . . . in there," and "men entered."
19  (*Id.* at 72; *see also id.* at 73, 76, 81, 82.) Vargas also testified that the woman "told me in

20

21  _____

22  [5] Boggs concedes that he failed to exhaust his claims that admission of the
   statements also violated his due process and Eighth Amendment rights. (Doc. 15 at 111.)
23  He argues that the ineffective assistance of PCR and appellate counsel excuses any
   procedurally defaulted aspects of the claim. (*Id.*) The ineffective assistance of PCR counsel
24  excuses only claims of ineffective assistance of trial counsel. *Pizzuto*, 783 F.3d at 1177.
   Boggs also failed to exhaust a claim that appellate counsel was ineffective in failing to raise
25  the due process and Eighth Amendment allegations in Claim 5, so appellate counsel
   ineffectiveness does not excuse the claim's default. *See Carpenter*, 529 U.S. at 451–53;
26  *Carrier*, 477 U.S. at 489–90. Those aspects of the claim are defaulted and barred from
27  review.

28

Spanish, some guys came in there . . . and she told me in Spanish that they are robbing." (*Id.* at 87.)

Officer Daniel Beutel testified that he responded to the Jack in the Box shortly after the initial 911 call. (*Id.* at 88–90.) He helped other officers assist Alvarado into the back of a patrol car. (*Id.* at 98–99.) While in the car, Beutel "asked her[] several times if she was injured and she said yes." (*Id.* at 99.) He also "asked her several times if there were people still inside and she made reference to two." (*Id.*) Based on her statements, Officer Beutel believed that the people who shot Alvarado might still be in the restaurant. (*Id.* at 100.)

On direct appeal, Boggs contended that the admission of Alvarado's statements violated his Sixth Amendment right to confrontation. The Arizona Supreme Court rejected the claim, finding that the Confrontation Clause did not apply to Alvarado's statements because they were not "testimonial evidence" under *Crawford*, 541 U.S. at 51, and *Davis v. Washington*, 547 U.S. 813 (2006). *Boggs*, 218 Ariz. at 337–38, 185 P.3d at 123–24. The court explained:

> The admission of Alvarado's statements did not violate Boggs' right to confrontation. As she lay dying on the ground just outside the restaurant, Alvarado told Vargas that "men entered," "they were robbing," and that she thought "they were still robbing." When Officer Beutal arrived, she told him that two people were in the store and repeatedly asked him for help.
>
> The circumstances in which Alvarado made the statements indicate that she was seeking aid for herself and the others inside the store to meet an ongoing emergency. Further, the officers' actions, including surrounding the restaurant and sending dogs in to confront anyone still inside the restaurant, demonstrate that they understood the situation to be an ongoing emergency. . . . Because Alvarado's statements described what appeared to be an ongoing emergency, they were non-testimonial.

*Id.* (citation omitted). The decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

The Confrontation Clause applies only to testimonial evidence. *Crawford*, 541 U.S. at 51. Testimony is defined as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* In *Davis*, the Court explained that:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.

Here, as the Arizona Supreme Court found, Alvarado's statements were not testimonial. Like the 911 caller in *Davis*, Alvarado was "speaking about events *as they were actually happening*, rather than 'describ[ing] past events.'" *Davis*, 547 U.S. at 827. The purpose of her statements "was to enable police assistance to meet an ongoing emergency." *Id.* at 828. The statements were not "formal" like the recorded station-house interview in *Crawford*. *Id.* at 827. Officer Buetel was seeking to determine "what is happening" not "what happened"; the questioning was not "part of an investigation into possibly criminal past conduct." *Id.* at 829–30.

The Arizona Supreme Court reasonably applied *Crawford* and *Davis* and determined that Alvarado's statements to Vargas and Beutel were nontestimonial. Boggs's Confrontation rights were not violated by introduction of the testimony. Claim 5 is denied.

**Claim 6**

Boggs alleges that "[t]he State's pretrial seizure of [his] legal documents violated his right to keep confidential his own pretrial preparations and his attorney-client communications" in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights. (Doc. 15 at 117.) The Arizona Supreme Court denied this claim on the merits. *Boggs*, 218 Ariz. at 336–37, 185 P.3d at 122–23.

Facts

Throughout the pretrial proceedings, Boggs complained that jail staff were

- 30 -

searching his cell and seizing his legal materials. On March 5, 2004, Boggs's counsel, Herman Alcantar, informed the court that "detention officers have gone into [Boggs's] cell and basically ransacked his legal materials." (RT 3/5/04 at 7.) Alcantar stated that he would first attempt to resolve the issue with the sheriff's department; the court replied, "I think that's the proper way to do it." (*Id.*)

On November 1, 2004, after the court had granted Boggs's motion to represent himself, Boggs indicated that jail staff had informed him he could only view the Medical Examiner's photographs for one hour at a time. (RT 11/1/04 at 10–11.) He also stated that he was given only one hour per day to make phone calls to his advisory counsel. (*Id.* at 12.) Finally, he told the court that jail staff had seized "legal paperwork," "evidence in the case" from his cell and had gone through his "legal box" and read and censored his mail. (*Id.* at 13–15.) The court asked the prosecutor to have counsel from the sheriff's office appear at a status conference to "let us know what their side of the story is" and to bring any items seized from Boggs's cell. (*Id.* at 16.)

At the status conference, Boggs suggested that jail staff were opening his legal mail. (RT 11/19/04 at 5–6.) He also claimed that "jail intelligence" was withholding his mail. (*Id.* at 8.) Counsel for the sheriff's office averred that no documents were being withheld but that he needed more information to address Boggs's contention that his legal mail was being opened. (*Id.* at 9–10.) The court responded that it expected the jail not to interfere with any communications between Boggs and his advisory counsel. (*Id.* at 11.) Counsel for the sheriff's office also informed the court that Boggs was given access to the Medical Examiner's photographs through advisory counsel. (*Id.* at 12.) The court concluded "there's nothing that I see now that would indicate to me that I need to intervene. I want the defendant to have reasonable access to counsel, reasonable access to the materials, and access to the materials that he's going to need to prepare for trial." (*Id.* at 13.)

At a status conference on January 7, 2005, Boggs again contended that "the jail continues to withhold my mail, both legal and regular mail." (RT 1/7/05 at 3.) At another status conference a month later, the State informed the court that the FBI had previously

been seizing Boggs's non-legal mail, but was "no longer doing it" and the mail had been returned to Boggs. (RT 2/7/05 at 3; ROA 202.) The FBI's monitoring of Boggs's non-legal mail was pursuant to a federal court order. (*Id.*) Boggs contended that jail staff had opened his legal mail outside his presence. (*Id.* at 4.) When asked whether he could show any prejudice as a result, Boggs stated that he could not be sure that all his mail had been delivered to him. (*Id.* at 5.)

The court held another status conference on February 25, 2005, at which Deputy Sheriff Erin Douglas, of the Maricopa County Sheriff's Department, testified. He stated that items were seized from Boggs's cell pursuant to a search warrant and that all items not listed in the warrant were returned. (RT 2/25/05 at 6.)

Douglas testified that on February 12, 2005, jail staff seized a letter from Boggs addressed to the trial prosecutor which stated, "Don't fuck with our chief. We have you on our radar. We know where you live and can get you. Breathe deep." (RT 2/25/05 at 7–8.) The letter also contained "some unknown black powder." (*Id.*) Another inmate said that Boggs had given him the letter to mail. (*Id.* at 8.) Detective Vogel contacted the jail to inform them that he had received a similar letter. (*Id.* at 8–9.) After learning of the letters, the Maricopa County Sheriff's Office began a search of Boggs's cell on February 15. (*Id.* at 9.) The search was stopped when Detective Vogel called and asked them to wait until a search warrant could be obtained and a special master appointed due to Boggs's *pro per* status. (*Id.*; RT 4/4/05 at 119–20.) Boggs was moved to another cell, items taken from his cell in the initial search were returned to the cell, and the cell was sealed until the search warrant was obtained. (RT 4/4/05 at 120–21.)

During the initial search, prior to the search warrant being issued, jail staff observed in Boggs's cell schematics of weapons, bombs, the jail, and the courthouse. (RT 2/25/05 at 9.) Once the search warrant issued, the items seized from Boggs's cell were secured and ultimately taken to another judge for an *in camera* review to determine what items were subject to the search warrant. (*Id.* at 10.) Boggs's advisory counsel was offered the opportunity to observe the judge's review of the items taken from Boggs's cell. He

declined, in order to avoid becoming a witness and creating a conflict of interest. (*Id.* at 13.)

Douglas testified that 18 items were taken pursuant to the search warrant, including two packs of batteries, diagrams of handguns, several blank legal pads, schematics of the Madison Street Jail, envelopes, and two letters to Detective Vogel dated January 5, 2004, and March 23, 2004. (*Id.* at 11–12.) The prosecutor informed the court that, other than the threatening letter that was addressed to him, he had not seen any of the items taken from Boggs's cell. (*Id.* at 12.)

Boggs claimed that some letters and items of discovery were taken and had not been returned. (*Id.* at 13–14.) The trial court ordered that all of the seized items be made available for Boggs and his advisory counsel to review. (*Id.* at 18–19.)

The court held an evidentiary hearing on April 4, 2005. Before the hearing, Boggs filed a supplemental motion detailing the items he believed had not been returned. (ROA 219.) Boggs claimed that he was missing three items: proposed questions of the State's witness regarding voluntariness, "possible areas of cross-examination and impeachment," and copies of police reports on which he had made notations. (*Id.*)

The State called Lieutenant Jacobs from the Sheriff's Office, who testified that items were removed from Boggs's cell based on information that he had written threatening letters. (RT 4/4/05 at 118.) He further confirmed that no items were taken in the initial search, prior to the seized items being taken to the special master. (*Id.* at 120, 125–26.) Additionally, the prosecutor stated that the only item from Boggs's cell that he had seen was a diary page showing Detective Vogel's address. (*Id.* at 158.) The court concluded that nothing indicated "that anything untoward occurred." (*Id.*)

<u>Analysis</u>

On direct appeal, the Arizona Supreme Court found there was no improper interference with Boggs's right to counsel. *Boggs*, 218 Ariz. 325, 336–37, 185 P.3d 111, 122–23. The court explained:

"not every intrusion into the attorney-client relationship results in a denial of effective assistance of counsel. Whether a Sixth Amendment violation exists depends on whether the intrusions were purposeful and whether the prosecution, either directly or indirectly, obtained evidence or learned of defense strategy from the intrusions." *State v. Pecard*, 196 Ariz. 371, 377 ¶ 28, 998 P.2d 453, 459 (App.1999) (citing *Weatherford v. Bursey*, 429 U.S. 545, 558, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977)).

In *Warner*, this Court addressed an argument similar to that made by Boggs. *See* 150 Ariz. at 125–28, 722 P.2d at 293–96. Jail personnel had seized all papers from Warner's cell in an attempt to secure evidence of alleged perjury. *Id.* at 125, 722 P.2d at 293. Jail staff returned the seized papers, including transcripts and summaries of conferences between the defendant and his counsel, to the defendant but provided copies to the prosecutor. *Id.* The prosecutor's assistant read the materials, and the prosecutor read some of the materials. *Id.* at 126, 722 P.2d at 294. Because the prosecutor viewed the privileged materials, we found a presumptive violation of the defendant's right to counsel. *Id.* at 127, 722 P.2d at 295.

Boggs' case differs from *Warner,* however, because the prosecutor here never received or reviewed any privileged items. In fact, the State protected the defendant's right to counsel by requesting that a special master review the seized materials and return any privileged items to Boggs. The trial court then held evidentiary hearings to address the alleged violation of Boggs' right to counsel. At the hearings, the court found the testimony of two MCSO officers and Detective Vogel credible and concluded that nothing "untoward occurred."

Thus, unlike the defendant in *Warner*, Boggs failed to show improper interference with his right to counsel.

*Id.* at 337, 185 P.3d at 123 (additional citations omitted).

This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. The Arizona Supreme Court reasonably concluded that the searches and the seizures of materials from Boggs's cell did not interfere with his attorney-client relationship or his ability to present his defense.

A special master reviewed the seized materials to determine whether any were privileged, and the prosecutor never received or reviewed any privileged materials. (RT

- 34 -

2/25/05 at 10, 12; RT 4/4/05 at 158.) Contrary to Boggs's conclusory assertions, nothing in the record suggests that jail staff read his legal mail. At the November 19 status conference, the court found that the opened letters Boggs claimed were legal mail were actually letters from Joyce Boggs, Boggs's grandmother. (RT 11/19/04 at 11, 14.) The record showed that the FBI monitored only Boggs's non-legal mail. (RT 2/7/05 at 3; ROA 202.)

The record further demonstrated that jail staff did not seize any legal documents, that all privileged materials were returned to Boggs after review by the special master, that jail staff did not review his legal mail, and that the prosecutor had no access to privileged material.[6] Therefore, there was no tainted evidence, no communication of defense strategy to the State, and no purposeful intrusion into the attorney-client relationship, and therefore no Sixth Amendment violation. *See Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)[7]; *see United States v. Fernandez*, 388 F.3d 1199, 1240 (9th Cir. 2004) (rejecting Sixth Amendment claim when there was no showing of purposeful interference with defendants' attorney-client relationship, "that any defense strategy was actually communicated to the government[,]" or "that any of the evidence presented at trial had been tainted by the alleged intrusion"), *modified by*, 425 F.3d 1248 (9th Cir. 2005). There was no interference with the attorney-client relationship and no prejudice to Boggs's defense. *See id*. Boggs

---

[6] Both parties cite *Wolff v. McDaniel*, 418 U.S. 539 (1974). In *Wolff* the Court held that a jail policy whereby legal mail could be opened only in the prisoner's presence "[does] all, and perhaps even more, than the Constitution requires." *Id.* at 577. Under the circumstances of this case, where the record does not support a finding that Boggs's legal mail was opened, *Wolff* is inapplicable.

[7] In *Weatherford*, an undercover law enforcement officer participated with the plaintiff in the commission of a crime. The officer, while still posing as a conspirator, was invited to meetings between plaintiff and his criminal defense counsel. The officer attended the meetings, but did not discuss or pass on to his supervisors or the prosecuting attorney "'any details or information regarding the plaintiff's trial plans, strategy, or anything having to do with the criminal action pending against the plaintiff.'" 429 U.S. at 548 (citation omitted).

has not met his burden of showing "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

Boggs contends that because the trial court "held only insufficient and piecemeal hearings on these issues," the Arizona Supreme Court's decision was based on an unreasonable determination of the facts. (Doc. 15 at 136–37.) In challenging the trial court's fact-finding process, Boggs must demonstrate "that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Taylor*, 366 F.3d at 1000. Boggs does not meet this burden. The trial court repeatedly addressed Boggs's concerns and held two separate hearings. Boggs's contention that the state court's fact-finding process was inadequate and that the state court unreasonably determined the facts does not satisfy § 2254(d)(2). *Id.* (explaining that factual determination is unreasonable only if "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record"). Claim 6 is denied

**Claim 15**

Boggs alleges that the Arizona courts violated his Confrontation Clause and Due Process rights by permitting the State to introduce improper and unreliable rebuttal evidence in the penalty phase of trial. (Doc. 15 at 224.) Boggs exhausted the due process aspect of this claim in state court.[8] The Arizona Supreme Court rejected the claim on the merits. *Boggs*, 218 Ariz. at 125–26, 185 P.3d at 339–40.

During the penalty phase, Boggs presented mental health evidence as mitigation. Boggs's experts diagnosed him with PTSD and bi-polar disorder. (RT 5/10/05 at 50–178.) Both experts testified about Boggs's membership and role in the militia he formed with

---

[8] Boggs concedes he did not exhaust his Confrontation Clause claim in state court. (Doc. 15 at 225.) He argues that the ineffective assistance of PCR and appellate counsel excuses any procedurally defaulted aspects of the claim. (*Id.*) The ineffective assistance of PCR counsel excuses only claims of ineffective assistance of trial counsel. *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27. Boggs also failed to exhaust a claim that appellate counsel was ineffective in failing to raise the Confrontation Clause allegations in Claim 15, so appellate counsel ineffectiveness does not excuse the claim's default. *See Edwards*, 529 U.S. at 451–53; *Carrier*, 477 U.S. at 489–90. Those aspects of the claim are defaulted and barred from review.

Hargrave, and whether the militia was a delusional manifestation of his bi-polar disorder. (*Id*. at 101–03, 105–07, 125–27, 160–63, 167–68.) After Boggs presented his mitigation evidence, the State advised the court that it would seek to enter in rebuttal the threatening letters Boggs wrote to Detective Vogel and the prosecutor. (RT 5/11/05 at 5.) Boggs objected to the admission of the evidence, arguing that the threatening letters did not rebut any of the mental health evidence he presented. (*Id*. at 4.) The trial court rejected Boggs's argument, finding that the letters were relevant to Boggs's mental health history and his involvement in the militia. (*Id*. at 6–7.)

The State then called Detective Vogel, who testified that he had received a letter that stated: "We warned you not to go near our chief. You did. Now you die. We know where you live. Breathe deep." (*Id*. at 49–51.) Vogel testified that as a result of the letter, Boggs's jail cell was searched and an address book was found with Vogel's name, a telephone number, and a residential address. (*Id*. at 51–53.) Detective Vogel also testified about a second letter addressed to the trial prosecutor that was intercepted at the jail. This letter stated, "Don't fuck with our chief. We have you on our radar. We know where you live and can get you. Breathe deep." (*Id*. at 53–54.)

On direct appeal, the court found the letters were relevant, not unduly prejudicial, and sufficiently reliable, and that their admission did not violate due process. *Boggs*, 218 Ariz. at 338–40, 185 P.3d at 124–26.

> We agree that the threatening letters are relevant to rebut mitigation testimony. The thrust of the mitigation was that Boggs suffers from mental health issues, including bipolar disorder. To support the diagnosis, two mental health experts, Drs. Ruiz and Lanyon, testified about Boggs' delusional involvement in a militia and suggested that, because the militia was a delusion, Boggs could not cause any harm through the entity. Dr. Ruiz stated that although she had no knowledge to confirm or disaffirm the militia's existence, she believed Boggs' militia activities to be delusional. When the State questioned Dr. Lanyon about the concrete manifestations of the current militia, including uniforms and weapons, he responded: "That to me seemed to support the delusional aspects of this that he was—had a big organization that was going to shake up the world or something, going to put bombs in, you know." Boggs' letters that threatened harm for mistreating the

- 37 -

leader of the militia rebuts the suggestion that Boggs' militia involvement was benign.

*Id.* at 125, 185 P.3d at 339. The court then determined that the letters were not unduly prejudicial because they were not admitted to show Boggs's bad character. *Id.* at 125–26, 185 P.3d at 339–40.

Next, the court found that the letters comported with the requirements of due process:

> Introduction of the letters at the penalty phase did not violate due process. As a primary matter, the threatening letters in this case were neither hearsay nor testimonial. Furthermore, Boggs knew of the threatening letters before the trial started, as he successfully kept them out of the guilt phase. Yet, Boggs failed to object on foundational grounds at the sentencing hearing. When the trial judge specifically asked the defense if it objected to the foundation of the evidence, the defense responded in the negative. On cross-examination, the defense questioned the reliability of the threatening letters by comparing the handwriting with another letter signed by Boggs and noting that one of the letters contained no evidence that it was sent from jail. Thus, the defense did address the letters' reliability before the jury, but did not object to their foundation.
>
> Boggs now asserts that the threatening letters are not reliable because the State provided insufficient proof that he wrote them. This argument is not persuasive. First, nearly identical letters were sent to the lead detective and to the prosecutor. Second, Boggs' militia title was "Chief of Staff," and the letters specifically referred to the "Chief." Third, jail staff intercepted one of the letters, which an inmate stated that Boggs had asked him to mail. Finally, the letters stated, "we know where you live," and Boggs possessed an address for Vogel. The introduction of the threatening letters at the penalty phase did not violate Boggs' due process rights.

*Id.* at 126, 185 P.3d at 340.

This decision is neither contrary to nor an unreasonable application of clearly established federal law, nor is it based on an unreasonable determination of the facts.

"Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Holley*, 568 F.3d at 1101. The Supreme Court has never held that the admission of irrelevant or

prejudicial evidence violates due process. *Id.* ("Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, . . . it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."). Because there is no clearly established federal law holding that the admission of the rebuttal testimony would amount to a constitutional violation, the Arizona Supreme Court's denial of this claim was not an "unreasonable application" under § 2254(d)(1). *See id.* at 1097–98 (citing *Carey v. Musladin*, 549 U.S. 70, 77 (2006)).

Nor was Detective Vogel's testimony regarding the letters so unduly prejudicial that it rendered Boggs's trial fundamentally unfair. *See Estelle*, 502 U.S. at 70; *Jammal*, 926 F.2d at 920. As the Arizona Supreme Court concluded, the testimony regarding the letters was relevant to rebut Boggs's mitigation evidence. Boggs placed his mental health at issue when he presented evidence claiming he suffered from PTSD and bi-polar disorder. His mental health experts testified that he suffered from delusions, including delusional beliefs about his participation in a militia. *Boggs*, 218 Ariz. at 339, 185 P.3d at 125. The letters served to rebut evidence that Boggs's role in a militia was delusional and therefore harmless. In addition, as the Arizona Supreme Court noted, *id.* at 340, 218 Ariz. at 126, the letters were supported by sufficient indicia of reliability that Boggs was their author. *See Williams v. Oklahoma*, 358 U.S. 576, 584 (1959) (holding that a court may "consider responsible unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics" without running afoul of due process). Claim 15 is denied.

**Claim 19**

Boggs alleges that the application of Arizona's newly-enacted death penalty statute to his case violated the *Ex Post Facto* Clause of the United States Constitution. (Doc. 15 at 308.) The Arizona Supreme Court rejected the claim on direct appeal. *Boggs*, 218 Ariz. at 344, 185 P.3d at 130.

Boggs committed the murders on May 19, 2002. He was indicted on June 14, 2002. The State filed its notice of intent to seek death on July 8, 2002.

On June 24, 2002, the United States Supreme Court invalidated Arizona's death penalty scheme under which judges rather than juries found the facts making a defendant eligible for the death penalty. *Ring v. Arizona* (*Ring I*), 536 U.S. 584 (2002). On August 1, 2002, Arizona amended its death penalty statute to comply with *Ring*.

According to Boggs, "[u]nder the law in place at the time of the notice of intent, Boggs could not be sentenced to death. The Arizona Supreme Court, in allowing the trial court's application of the newly enacted death penalty statute to stand, violated the prohibition on the retroactive application of substantive changes in the law." (Doc. 15 at 309.) This argument is incorrect.

In denying this claim, the Arizona Supreme Court cited its opinion in *State v. Ring* (*Ring II*), 204 Ariz. 534, 545–47, 65 P.3d 915, 926–28 (2003), holding that the *Ex Post Facto* Clause did not prohibit the resentencing of capital defendants after *Ring I* because the new statute provided for only procedural changes and did not place defendants in jeopardy of a greater punishment. *Boggs*, 218 Ariz. at 344, 185 P.3d at 130.

The *ex post facto* doctrine prohibits a state from "retroactively alter[ing] the definitions of crimes or increas[ing] the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). "[A]ny statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*." *Dobbert v. Florida*, 432 U.S. 282, 292 (1977) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70 (1925)).

In *Dobbert*, the defendant was sentenced to death in Florida under a capital sentencing system that was subsequently declared unconstitutional. 432 U.S. at 288. Dobbert argued that he could not be sentenced to death under the amended Florida procedures because at the time of his original sentencing the death penalty was not an

available punishment. *Id.* at 297. The Supreme Court rejected the argument and held that there was no *ex post facto* violation because the changes in Florida's statute were "clearly procedural." *Id.* at 293. "The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." *Id.* at 293–94.

Under *Dobbert*, the post-*Ring* procedural changes in Arizona's death penalty are not *ex post facto* laws. *See Schriro v. Summerlin*, 542 U.S. 348, 353–54 (2004) ("*Ring*'s holding is properly classified as procedural.").

Boggs's argument is not distinguishable from the claim rejected in *Dobbert*, where the defendant contended there was "no death penalty 'in effect' in Florida" when he committed the murders. 432 U.S. at 297. The Court responded that "this sophistic argument mocks the substance of the Ex Post Facto Clause." *Id.* Similarly, the statute in place at the time Boggs committed the murder and the statute enacted after *Ring* provided for the same quantum of punishment. While *Ring I* invalidated the procedure by which the death penalty was imposed in Arizona, it did not eliminate the death penalty as a possible sentence for first-degree murder.

The decision of the Arizona Supreme Court rejecting Boggs's *ex post facto* claim was neither contrary to nor an unreasonable application of clearly established federal law. Claim 19 is denied.

**Claim 25**

Boggs alleges that because the aggravating factors were not included in the indictment, he was not provided sufficient notice of the factors, and there was no finding of probable cause as to any of the aggravating factors, as required by the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 15 at 392.) The Arizona Supreme Court denied this claim on direct appeal. *Boggs*, 218 Ariz. at 344, 185 P.3d at 130.

This claim is meritless. The Supreme Court has held that facts constituting the elements of an offense rather than just a sentencing enhancement must be charged in a *federal* indictment. *See Jones v. United States*, 526 U.S. 227, 251–52 (1999). However, the

Fifth Amendment Due Process Clause does not incorporate the same requirements into state criminal prosecutions by virtue of the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S. 516, 538 (1884); *see also Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972). Because states are not required by the Constitution to empanel grand juries for purposes of indictment, they are not required to specify aggravating factors in an indictment. Claim 25 is denied.

**Claim 27**

Boggs alleges that the trial court's instructions limited the mitigating evidence the jury could consider, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 15 at 398.) The Arizona Supreme Court denied this claim on appeal. *Boggs*, 218 Ariz. at 344, 185 P.3d at 130.

The United States Supreme Court has specifically rejected the argument that the Arizona statute is unconstitutional because it imposes on defendants the burden of establishing, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency. *Walton v. Arizona*, 497 U.S. 639, 649–51 (1990), *overruled on other grounds by Ring I*, 536 U.S. at 584. While Boggs cites *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) for the proposition that "the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence," *Walton* still controls the outcome of this claim.

Since its decision in *Tennard*, the Supreme Court has subsequently reaffirmed that the reasoning in *Walton* applies to the burdens of persuasion in capital sentencings. *See Kansas v. Marsh*, 548 U.S. 163, 173 (2006) (holding that "a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances"). Thus, once the government has properly carried its burden of establishing death eligibility, "it [does] not offend the Constitution to put the burden on [defendant] to prove any mitigating factor by a preponderance of the evidence." *United States v. Mitchell*, 502 F.3d 931, 993 (9th Cir. 2007) (citing *Marsh*, 548 U.S. at 173, and

*Walton*, 497 U.S. at 649); *see also Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994). Claim 27 is denied.

**Claim 29**

Boggs alleges that Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it creates a presumption of a sentence of death and requires a defendant to affirmatively prove that the sentence should spare his life. (Doc. 15 at 402.) The Arizona Supreme Court denied this claim on appeal. *Boggs*, 218 Ariz. at 345, 185 P.3d at 131. The claim is meritless.

In *Walton*, the Supreme Court rejected the argument that "Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the Constitution." 497 U.S. at 651. *Walton* also rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency. *Id.* at 651–52 (citing *Blystone v. Pennsylvania*, 494 U.S. 299 (1990), and *Boyde v. California*, 494 U.S. 370 (1990)); *see also Marsh*, 548 U.S. at 173 (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998) (summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty statute and its failure to apply a beyond-a-reasonable-doubt standard). In addition, the Supreme Court has held that a capital sentencer "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 979 (1994). Claim 29 is denied.

**Claim 31**

Boggs alleges that Arizona's capital-sentencing scheme discriminates against young, indigent male defendants, in violation of the Fourteenth Amendment. (Doc. 15 at 405.) The Arizona Supreme Court denied this claim on appeal. *Boggs*, 218 Ariz. at 345, 185 P.3d at 131. The claim is meritless.

Clearly established federal law holds that "a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)). Therefore, to prevail on this claim Boggs "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.*

Boggs's statistical claim that male murderers are overrepresented on Arizona's death row in comparison to the population of murderers generally is insufficient to meet this burden. *See Richmond v. Lewis*, 948 F.2d 1473, 1490–91 (9th Cir. 1990) (holding that statistical evidence that Arizona's death penalty is discriminatorily imposed based on race, sex, and socioeconomic background is insufficient to prove that decision makers in petitioner's case acted with discriminatory purpose) *vacated on other grounds*, 986 F.2d 1583 (9th Cir. 1993). Boggs fails to allege any facts to suggest that the jury in *his* case acted with discriminatory purpose. Claim 31 is denied.

**Claim 32**

Boggs alleges that the absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments. (Doc. 15 at 407.) The Arizona Supreme Court denied this claim on appeal. *Boggs*, 218 Ariz. at 345, 185 P.3d at 131. The claim is meritless.

There is no federal constitutional right to proportionality review of a death sentence. *McCleskey*, 481 U.S. at 306 (citing *Pulley v. Harris*, 465 U.S. 37, 43, 50–51 (1984)). The Arizona Supreme Court discontinued the practice in 1992, *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992). The Ninth Circuit has explained that the "substantive right to be free from a disproportionate sentence" is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996). Claim 32 is denied.

**Claim 33**

Boggs alleges that the prosecutor's discretion to seek the death penalty is without standards and therefore violates the Eighth and Fourteenth Amendments. (Doc. 15 at 408.) The Arizona Supreme Court denied this claim on appeal. *Boggs*, 218 Ariz. at 345, 185 P.3d at 131. This claim is meritless.

The Supreme Court has held that prosecutors have wide discretion in making the decision whether to seek the death penalty. *See McCleskey*, 481 U.S. at 296–97; *Gregg v. Georgia*, 428 U.S. 153, 199 (1976) (holding that pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional). In *Smith*, the Ninth Circuit rejected the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." 140 F.3d at 1272. Claim 33 is denied

**Claim 34**

Boggs alleges that Arizona's death penalty scheme is unconstitutional because it provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances, in violation of the Eighth and Fourteenth Amendments. (Doc. 15 at 409.) The Arizona Supreme Court denied this claim on appeal. *Boggs*, 218 Ariz. at 345–46, 185 P.3d at 131–32. This claim is meritless.

The Supreme Court has held that a "capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa*, 512 U.S. at 979; *see Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988) ("[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."); *Zant v. Stephens*, 462 U.S. 862, 875 n.13 (1987) (explaining that "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required"). Claim 34 is denied.

**Claim 35**

Boggs alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a death sentence whenever one aggravating

circumstance and no mitigating circumstances are found with respect to an eligible defendant. (Doc. 15 at 410.) The Arizona Supreme Court denied this claim on appeal. *Boggs*, 218 Ariz. at 346, 185 P.3d at 132. This claim is meritless.

Arizona's death penalty scheme allows certain, statutorily-defined aggravating factors to be considered in determining eligibility for the death penalty. For death to be an appropriate sentence, at least one aggravating factor must be found and the court must determine that mitigating circumstances do not warrant a lesser sentence. Again, this scheme has been found constitutionally sufficient. *See Lewis v. Jeffers*, 497 U.S. 764, 774–77 (1990); *Walton*, 497 U.S. at 649–56; *Woratzeck v. Stewart*, 97 F.3d 329, 334–35 (9th Cir. 1996); *see also Smith*, 140 F.3d at 1272. Claim 35 is denied.

**Claim 36**

Boggs alleges that the trial court violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments by allowing victim impact evidence to be presented at the penalty phase of his trial. (Doc. 14 at 412.) The Arizona Supreme Court denied this claim on appeal. *Boggs*, 218 Ariz. at 346, 185 P.3d at 130. The claim is without merit.

In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the introduction of a victim impact statement to a capital sentencing jury violated the Eighth Amendment. In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the Court revisited *Booth*, overruling it in part. The Court held that the Eighth Amendment does not erect a *per se* barrier to the admission of victim impact evidence but left intact *Booth*'s prohibition on the admission of characterizations and opinions from the victim's family about the crime, the defendant, or the appropriate sentence. *Id.* at 830 n.2.

At Boggs's sentencing, the trial court allowed family members of the three victims to make statements. (RT 5/9/05 at 16–48.) The court instructed the jury that "the law allows victims, relatives, close relatives of the decedents in this case to provide you with information about the impact of the death of the decedents upon them and their families," and informed the jury that it "may consider this information to the extent it may rebut

mitigation provided by the defendant. You may not consider the information as new, aggravating circumstances." (*Id.* at 15.)

Boggs asserts that the victim impact statements commented on the crime, but this is not supported by the record. Instead, the statements described the family members' feelings of loss. (RT 5/9/05 at 16–48.) The statements were therefore permissible "evidence about the victim and about the impact of the murder on the victim's family." *Payne*, 501 U.S. at 827. The statements did not offer characterizations about the crime, the defendant, or the appropriate sentence. *Payne*, 501 U.S. at 830 n.2. To the extent any of the statements referred to the crime, their admission did not have a "substantial and injurious effect or influence in determining" Boggs's sentence. *Brecht*, 507 U.S. at 637; *see, e.g.*, *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002) (applying harmless error standard to admission of improper victim impact statement).

Boggs also contends that his Confrontation Clause rights were violated because the victim impact statements were not subjected to cross-examination. This argument fails because Sixth Amendment confrontation rights do not apply in sentencing proceedings. *See United States v. Littlesun*, 444 F.3d 1196, 1199 (9th Cir. 2006) ("*Crawford* does not expressly speak to sentencing. . . . *Crawford* speaks to trial testimony, not sentencing."); *see also, e.g.*, *United States v. Monteiro*, 417 F.3d 208, 215 (1st Cir. 2005); *United States v. Martinez*, 413 F.3d 239, 243 (2d Cir. 2005); *United States v. Kirby*, 418 F.3d 621, 627–28 (6th Cir. 2005); *United States v. Fleck*, 413 F.3d 883, 894 (8th Cir. 2005); *United States v. Cantellano*, 430 F.3d 1142, 1146 (11th Cir. 2005). Claim 36 is denied.

## C. Ineffective Assistance of Counsel Claims

In Claims 12, 14, 16, and 20, Boggs raises numerous allegations of ineffective assistance of trial and appellate counsel.

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88. The inquiry under *Strickland*

is highly deferential. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 558 U.S. 15, 16–17 (2009) (per curiam); *Bobby v. Van Hook*, 558 U.S. 4, 7–9 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010).

To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). "The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001) (citing *Strickland*, 466 U.S. at 689).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. This showing "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 563 U.S. at 189 (quoting *Richter*, 562 U.S. at 112).

Under the AEDPA, ineffective assistance of counsel claims are subject to two layers of deference. "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105; *see Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (discussing "doubly deferential judicial review that applies to a *Strickland* claim under the § 2254(d)(1) standard").

**Claim 12**

Claim 12 consists of nine allegations of ineffective assistance of counsel at the guilt phase of trial. (Doc. 15 at 175–211.) Boggs raised two of the claims, 12(A) and 12(B), during the PCR proceedings where they were rejected on the merits. Boggs alleges that the default of the remaining claims is excused under *Martinez* by the ineffective assistance of PCR counsel.

<u>Background</u>

Boggs was indicted on three counts of first-degree murder on June 14, 2002. (ROA 19.) On July 10, 2002, the court appointed Maria Schaffer, with the Office of the Legal Advocate, to represent Boggs. Schaffer was later joined by James Logan. (ROA 33.) In April 2003, Schaffer and Logan were authorized to withdraw from Boggs's case. (ROA 109.) Herman Alcantar was appointed to take over representation and was later joined by Nathaniel Carr as second chair. (ROA 115.) Boggs was granted *pro per* status on September 3, 2004, and trial counsel were ordered to remain on the case as advisory counsel. (ROA 170.) Trial counsel resumed their representation of Boggs after jury selection on April 11, 2005. (ROA 235.)

<u>Claim 12(A)</u>

Boggs alleges that trial counsel performed ineffectively by failing to file numerous motions and make accompanying objections.[9] (Doc. 15 at 176.) Boggs asserts that counsel should have filed motions in limine to keep out damaging evidence, challenges to Boggs's competency, challenges to the aggravating factors, and challenges to the constitutionality of the death penalty. (Doc. 15 at 178–79.)

The PCR court rejected this claim. The court first reviewed the motions that Boggs contended should have been filed. (Doc. 21, Ex. K, ROA-PCR 64 at 7.) The court then concluded:

---

[9] As Boggs notes, previous counsel Schaffer and Logan filed "numerous substantive motions," including motions to stay the proceedings due to the decision in *Ring I* and to strike the allegation of death, for a competency evaluation under Rule 11, to suppress statements, to preclude use of victim impact evidence, and a response to the State's use of Rule 404(b) evidence. (Doc. 15 at 177.)

These motions have been rejected by the Arizona Supreme Court, either in Petitioner's direct appeal or in other capital appeals. *See, e.g.*, *Boggs*, 218 Ariz. at 339, 340-42, 346, 185 P.3d at 124–25, 126–28, 132 (presumption of death; limiting State's rebuttal in penalty phase; striking aggravators); *State v. Villalobos*, 225 Ariz. 74, 83, 235 P.3d 227, 236 (2010) (nexus between mitigation and offense); *State v. Hargrave*, 225 Ariz. 1, 21, 234 P.3d 569, 589 (2010) (challenges to A.R.S. § 13-703); *State v. Moore*, 222 Ariz. 1, 17, 213 P.3d 150, 166 (2009) (death qualification of jurors). Counsel is not ineffective for failing to raise issues that have been rejected by higher courts. In addition, Petitioner concedes that counsel filed a number of pretrial motions, negating his claim that counsel failed to subject the case to meaningful adversarial testing. *See State v. Atwood*, 171 Ariz. 576, 832 P.2d 593 (1992); *see also Strickland*, 466 U.S. at 688 ("Counsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process") (citation omitted).

Based on the foregoing, the Court finds that Petitioner has failed to raise a colorable claim for relief and to establish either deficient performance or prejudice.

(*Id.*)

This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

Quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984), Boggs argues that when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." (Doc. 15 at 181–82.) He contends that the PCR court erred because under *Cronic* prejudice is presumed. (*Id.* at 182.) This argument fails because *Cronic* is inapplicable under the circumstances of this case.

*Cronic* is "reserved for situations in which counsel has entirely failed to function as the client's advocate." *Florida v. Nixon*, 543 U.S. 175, 189 (2004). In *Bell v. Cone*, 535 U.S. 685, 696–97 (2002), the Court explained that to meet the *Cronic* standard "the attorney's failure must be complete." *See United States v. Thomas*, 417 F.3d 1053, 1057 (9th Cir. 2005) (explaining that in *Cone* "the Court emphasized that *Cronic*'s exception for failing to test the prosecution's case applies when the attorney's failure to oppose the

prosecution goes to the proceeding as a whole—not when the failure occurs only at specific points in the trial").

Boggs does not argue that trial counsel failed to oppose the prosecution throughout the proceeding as a whole, only that they failed to file and respond to specific motions. This does not meet the *Cronic* standard. As Respondents note, the State's case was subjected to meaningful adversarial testing through prior counsel's motions, Boggs' *pro per* motions and arguments, cross-examination of the State's witnesses, counsel's opening statements and closing arguments in all three phases of trial, counsel's objections to some of the State's militia evidence, and the presentation of mitigation evidence in the penalty phase. (Doc. 21 at 159–60.)

The PCR court properly applied the *Strickland* standard to this claim and reasonably determined that Boggs had shown neither deficient performance nor prejudice based on counsel's failure to file certain motions. This claim falls short of satisfying the "doubly deferential" standard of *Strickland* and § 2254(d). *Richter*, 562 U.S. at 105. Claim 12(A) is denied.

Claim 12(B)

Boggs alleges that counsel performed ineffectively by failing to adequately object to or rebut the State's 404(b) evidence concerning Boggs's involvement in a militia and his white supremacist views. (*Id.* at 183.) The PCR court rejected the claim:

> Petitioner was involved in a militia group known as the "Imperial Royal Guard." Beyond the evidence demonstrating that the purpose of the "Imperial Royal Guard" was to "uplift" the white race, in January 2004 Petitioner had sent a letter to the lead detective in his case in which he stated that "his motivation for the murders was *not pecuniary, but rather, based on race.*" *Boggs,* 218 Ariz. at 331, 185 P.3d at 117 (emphasis added). In this case the victims were all members of minority groups.

> Petitioner's views on "uplifting" the white race and fostering negative views of minority groups served not only as a motive for the murders, but also explained his association with Hargrave and their respective girlfriends and his willingness to become involved in the crimes. His own words render the militia testimony both relevant and admissible, albeit prejudicial. The jurors

were provided with context for the murders enabling them to understand Petitioner's motivation.

Under the circumstances presented, the militia evidence was admissible under Rule 404(b). Accordingly, Petitioner's counsel was not ineffective for failing to object to its admission. *See State v. Pereida*, 170 Ariz. 450, 454, 825 P.2d 975, 979 (App. 1992) (failure to object to admissible evidence not deficient performance). Moreover, counsel raised an objection prior to trial but the court did not consider the objection due to Petitioner subsequently being allowed to represent himself.FN4

> FN4. In January 2003, Petitioner's counsel filed a response opposing the State's motion regarding the use of Rule 404(b) evidence. Subsequently Petitioner was allowed to proceed *pro per* but then, during jury selection, asked that counsel provide assistance. The 404(b) motion therefore was not addressed by counsel until just before opening statements when the prosecutor indicated that he would refer to the militia connection during opening.

Based on the foregoing, the Court finds that Petitioner has failed to raise a colorable claim for relief and to establish either deficient performance or prejudice. It was Petitioner personally who contended pretrial that the murders were racially motivated. He cannot now complain that counsel acted ineffectively when his own actions rendered the complained-of evidence admissible.

(Doc. 21, Ex. K, ROA-PCR 64 at 5.)

This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

As the PCR court found, counsel did not perform ineffectively because the militia evidence was admissible. "Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel." *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *see Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (explaining that "the failure to take a futile action can never be deficient performance"); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.").

The State offered the militia evidence to show racial bias as a motive for the murders. The Arizona Supreme Court concluded that a "racial motivation" applied to all

three murders. *Boggs*, 218 Ariz. at 342, 183 P.3d at 128. In Hargrave's appeal from his conviction, the Arizona Supreme Court held that the militia evidence was properly admitted under Rule 404(b) because it "was relevant to establish a motive for the crimes and its probative value was not substantially outweighed by the prejudice it might have caused." *State v. Hargrave*, 225 Ariz. 1, 9, 234 P.3d 569, 577 (2010). Because the evidence was admissible, any potential objection was futile, and the PCR court reasonably concluded that counsel's failure to challenge the evidence did not amount to ineffective assistance of counsel.

Boggs asserts that counsel should have challenged and rebutted the militia evidence with evidence that Boggs's involvement with a militia group was a fantasy or a delusion. As Respondents note, however, such evidence would not have affected the admissibility of the militia and racial bias evidence as proof of motive. Moreover, evidence of the militia's limited size and scope was presented to the jury, which learned that the militia consisted only of Boggs, Hargrave, and their girlfriends. (RT 4/13/05 at 41, 58.)

The PCR court's denial of this claim falls short of satisfying the "doubly" deferential standard of *Strickland* and § 2254(d). *Richter*, 562 U.S. at 105. Claim 12(B) is denied.

Claim 12(C)

Boggs did not present the remaining allegations of Claim 12 in state court. The default of these claims, however, is not excused under *Martinez*. Boggs has not established that PCR counsel's performance was ineffective—i.e., both deficient and prejudicial— under *Strickland*. Therefore, he fails to establish cause for the claims' default. *Martinez*, 566 U.S. at 14; *Ramirez*, 937 F.3d at 1241; *see Clabourne*, 745 F.3d at 377 (explaining that prejudice, for purpose of assessing PCR counsel's performance, is connected to the strength of the underlying ineffective assistance of trial counsel claim).

In defaulted Claim 12(C), Boggs alleges that trial counsel performed ineffectively by failing to ensure that bench conferences and off-the-record conversations were recorded by the court reporter and by failing to make several *pro per* motions filed by Boggs part of

the appellate record. (Doc. 15 at 195–97.) PCR counsel did not perform ineffectively in failing to raise this claim.

On direct appeal, the Arizona Supreme Court granted Boggs's motion for a remand to reconstruct the record on his penalty-phase *pro per* motion. (*See* RT 12/15/06.) With respect to Boggs's *pro per* motions to represent himself, the trial judge stated they "were similar in what they said," were "very bare bones," and "cited the *Faretta* case and the rule." (RT 12/21/06 at 28.) He further recalled that the motions contained no information that did not exist elsewhere in the record. (*Id.*)

The PCR court addressed Boggs's claim that his rights were violated by the trial court's failure to record bench conferences. The court found "there is no indication that [Boggs] was prejudiced" and "no allegation that following such sidebars the trial court took action, or refrained from taking action, detrimental to [Boggs]'s rights or interests." (Doc. 21, Ex. K, ROA-PCR 64 at 13.)

Under these circumstances, Boggs cannot meet his burden of proving that PCR counsel performed deficiently or that he was prejudiced by PCR counsel's failure to raise this claim. PCR counsel raised a claim challenging the trial court's failure to record bench conferences. There was not a reasonable probability that the result of the PCR proceedings would have been different if counsel had raised a claim challenging trial counsel's handling of the same issue. Therefore, Boggs fails to establish cause under *Martinez* for the default of Claim 12(C), which remains defaulted and barred from federal review.

Claim 12(D)

In this defaulted claim, Boggs alleges that trial counsel performed ineffectively by failing to challenge gruesome crime scene and autopsy photos. (Doc. 15 at 197.) PCR counsel did not perform ineffectively in failing to raise this claim.

Under Arizona law, photographs of a murder victim's body are relevant because "the fact and cause of death are always relevant in a murder prosecution." *State v. Spreitz*, 190 Ariz. 129, 142, 945 P.2d 1260, 1273 (1997). Specifically, photographs of a victim's body may be relevant:

to prove the corpus delicti, to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the homicide was committed.

*State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983), *superseded on other grounds by* A.R.S. § 13-756. Gruesome photos are admissible unless their sole purpose is to inflame the jury. *Id*.

As Respondents note, the photographs here served a variety of purposes, demonstrating the fact and cause of the victims' deaths, assisting the jury in understanding the crime scene, showing that the killings were premeditated and that the victims suffered mentally as they were led into the freezer and shot, and illustrating the medical examiner's testimony.

Boggs contends that the testimony of the medical examiner and the officers who saw the crime scene removed any probative value of the photographs. This argument is unpersuasive. "The State 'cannot be compelled to try its case in a sterile setting.'" *State v. Bocharski*, 200 Ariz. 50, 56, 22 P.3d 43, 49 (2001). His argument that the photographs were relevant only to uncontested issues fails because an "assertion that the photos were probative only of matters not in dispute does not render them irrelevant as the state must carry its burden of proof on uncontested issues as well as contested ones." *State v. Canez*, 202 Ariz. 133, 154, 42 P.3d 564, 585 (2002), *abrogated on other grounds by* Ariz. R. Crim. P. 16.2(b).

Because Boggs fails to show that the photographs were inadmissible, he cannot show that PCR counsel was ineffective in failing to allege that trial counsel performed ineffectively by failing to raise a meritless objection to the photos' admission. *See James*, 24 F.3d at 27. There was not a reasonable probability that the result of the PCR proceedings would have been different if counsel had raised the trial counsel ineffectiveness claim. Therefore, Boggs fails to establish cause for the default of Claim 12(D), which remains defaulted and barred from federal review.

Claim 12(E)

In this defaulted claim, Boggs alleges that trial counsel performed ineffectively by failing to object to improper guilt-phase jury instructions. (Doc. 15 at 199.) PCR counsel did not perform ineffectively in failing to raise this claim.

Boggs alleges the trial court erred in giving two guilt-phase jury instructions: the instruction that "[p]roof beyond a reasonable doubt leaves you firmly convinced of the defendant's guilt" and the instruction that "[t]he defendant's guilt or innocence is not affected by the fact that another person or persons might have participated or cooperated in the crime and are not on trial now." (RT 5/2/05 at 98, 105.)

Both instructions were proper under Arizona law so objection would have been futile. *See State v. Forde*, 315 P.3d 1200, 1222, (2014) ("We approved [the 'firmly convinced'] instructions in *State v. Portillo,* 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995), and have repeatedly rejected challenges to them."). The "other participant" instruction reflects Arizona's standard jury instructions. *See* State Bar of Arizona, *Revised Arizona Jury Instructions (Criminal)* Std. 12, at 22 (2012).

Trial counsel were not ineffective for failing to make futile objections to these instructions. *See James*, 24 F.3d at 27. PCR counsel was not ineffective for failing to raise this claim of ineffective assistance of trial counsel because there was not a reasonable probability that the result of the PCR proceedings would have been different if the claim had been raised. Therefore, Boggs fails to establish cause for the default of Claim 12(E), which remains defaulted and barred from federal review.

Claim 12(F)

In this defaulted claim, Boggs alleges that trial counsel performed ineffectively by failing to object to the admission of Hargrave's statements blaming Boggs for the murders and by failing to request a limiting instruction. (Doc. 15 at 200.) PCR counsel did not perform ineffectively in failing to raise this claim.

First, the Arizona Supreme Court held that the statements attributed to Hargrave "were admissible at least for the limited purpose of showing the context of the

interrogation" and that their admission did not violate Boggs's Confrontation Clause rights. *Boggs*, 218 Ariz. 334, 185 P.3d at 120. Since the statements were admissible, trial counsel did not perform ineffectively by failing to make a futile objection. *See James*, 24 F.3d at 27.

Next, Boggs cannot show that he was prejudiced by counsel's failure to request a limiting instruction. Given the evidence against Boggs, including his own recorded statements to Detective Vogel, there was not a reasonable probability of an acquittal if the jury had received an instruction explaining that the statements attributed to Hargrave "were introduced as part of the interrogation and could not be used to prove the truth of the matters asserted."

PCR counsel did not perform ineffectively by failing to raise this claim of ineffective assistance of trial counsel. There was not a reasonable probability that the result of the PCR proceedings would have been different if counsel had raised the claim. Boggs fails to establish cause for the default of Claim 12(F), and the claim remains defaulted and barred from federal review.

Claim 12(G)

In this defaulted claim, Boggs alleges that trial counsel performed ineffectively by failing to object to, or request a limiting instruction for, Detective Vogel's statements in the videotaped interrogations accusing Boggs of lying. (Doc. 15 at 203.) PCR counsel did not perform ineffectively in failing to raise this claim.

The Arizona Supreme Court held that Boggs was not prejudiced by Vogel's statements "because [Boggs] did, in fact, provide multiple stories about his involvement; the jury did not need Vogel's comments to know that Boggs lied." *Boggs*, 218 Ariz. at 335, 185 P.3d at 121. Because Boggs suffered no prejudice, trial counsel's performance was not ineffective under *Strickland*.

There was not a reasonable probability that the result of the PCR proceedings would have been different if counsel had raised this claim. Boggs fails to establish cause for the default of Claim 12(G), and the claim remains defaulted and barred from federal review.

Claim 12(H)

In this defaulted claim, Boggs alleges that trial counsel provided ineffective assistance by failing to object to admission of victim Alvarado's statements. (Doc. 15 at 206.) PCR counsel did not perform ineffectively in failing to raise this claim.

As explained above, Alvarado's statements were nontestimonial and admissible under *Crawford*. *See Boggs*, 218 Ariz. at 337–38, 185 P.3d at 123–24. Trial counsel was not ineffective for failing to raise a futile objection. *See James*, 24 F.3d at 27. There was not a reasonable probability that the result of the PCR proceedings would have been different if counsel had raised the underlying ineffective assistance of trial counsel claim. Boggs fails to establish cause for the default of Claim 12(H), which remains defaulted and barred from federal review.

Claim 12(I)

In this defaulted claim, Boggs alleges that trial counsel performed ineffectively by failing to pursue a motion to dismiss or remand to the grand jury for a new finding of probable cause on the aggravating factors. (Doc. 15 at 207.)

The Arizona Supreme Court rejected the underlying argument on direct appeal. *Boggs*, 218 P.3d at 344, 185 P.3d at 130 (citing *McKaney v. Foreman ex rel. Cty. of Maricopa*, 100 P.3d 18, 23 (2004)). Trial counsel were not ineffective for failing to raise a futile objection to the indictment's lack of aggravating factors. *See James*, 24 F.3d at 27. PCR counsel was not ineffective for failing to raise such a claim and there was not a reasonable probability that the result of the PCR proceedings would have been different if the claim had been raised. Boggs fails to establish cause for the default of Claim 12(I), and the claim remains defaulted and barred from federal review.

Claim 12(J)

Boggs alleges that he suffered cumulative prejudice from trial counsel's errors. (Doc. 15 at 210.)

The United States Supreme Court has not specifically recognized the doctrine of cumulative error as an independent basis for habeas relief. The Ninth Circuit has held that

in some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may nonetheless prejudice a defendant so much that his conviction must be overturned. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Here, however, the Court has not identified any constitutional errors. Therefore, "[b]ecause there is no single constitutional error in this case, there is nothing to accumulate to the level of a constitutional violation." *Id.*

Because Supreme Court precedent does not recognize the doctrine of cumulative error, and because this Court has determined that no prejudice resulted from the errors alleged by Boggs, the allegation of cumulative prejudice is meritless.

Trial counsel was not ineffective for failing to raise a claim of cumulative prejudice. PCR counsel was not ineffective for failing to raise a claim of ineffective assistance of trial counsel. There was not a reasonable probability that the result of the PCR proceedings would have been different if the claim had been raised. Boggs fails to establish cause for the default of Claim 12(J), which remains defaulted and barred from federal review.

Conclusion

With respect to the exhausted aspects of Claim 12, Boggs has not met his double burden under *Strickland* and the AEDPA. With respect to the defaulted elements of Claim 12, Boggs has failed to show cause for the default under *Martinez*. Claim 12 is denied.

**Claim 14**

Boggs alleges that trial counsel performed ineffectively "because they failed to take reasonable steps to prevent the jury findings of aggravating circumstances." (Doc. 15 at 217.) Specifically, Boggs argues that counsel should have objected to the multiple-homicide jury instruction given pursuant to A.R.S. § 13–703(F)(8) as unconstitutionally vague. He also contends that counsel failed to argue that insufficient evidence supported the aggravating circumstance and failed to seek an instruction that the State must prove each element of the circumstances beyond a reasonable doubt.

Boggs did not raise these allegations in state court. Their default is not excused under *Martinez* by the ineffective assistance of PCR counsel.

<u>Claim 14(A)</u>

Boggs argues that trial counsel were ineffective for failing to object to the court's jury instruction as unconstitutionally vague because the instruction failed to explain that the jury must find that the murders were motivationally, spatially, *and* temporally related. (Doc. 15 at 219.)

With respect to the multiple-homicides factor, the court instructed the jury:

> In order to prove the defendant committed the offense at the same time he committed other homicides for which he has been convicted, the State must prove the defendant was convicted of murder in the first degree for an offense that occurred in close proximity to the offense and that occurred within moments of the other offense, or the offenses occurred during a short, uninterrupted time span, and for which the defendant had a similar motivation.

(RT 5/4/05 at 17–18.)

Contrary to Boggs's argument, this instruction sets out the elements required to prove the multiple-homicides factor.

To satisfy the multiple-homicides aggravating circumstance, the murders must have a "'temporal, spatial, and motivational relationship' such that they 'were a part of a continuous course of criminal conduct.'" *State v. Ellison*, 213 Ariz. 116, 143, 140 P.3d 899, 926 128 (2006) (quoting *State v. Lavers*, 168 Ariz. 376, 393–94, 814 P.2d 333, 350–51 (1991)).

The evidence clearly established that the murders had a temporal, spatial, and motivational relationship and were a part of a continuous course of criminal conduct. They were spatially and temporally related because all three victims were murdered at the same time and in the same place. *See Boggs*, 218 Ariz. at 330, 185 P.3d at 116. In addition, as the Arizona Supreme Court explained in finding that the factor had been proved:

> all the murders involved a continuous course of criminal conduct. The evidence, including Boggs' admission from his June 6 interrogation, demonstrates that the victims were killed, at least in part, as a means of witness elimination so that they could not identify the perpetrators. Boggs

also stated that the victims were shot in the freezer to lessen the gunshot noise and avoid detection. This evidences that the murders were intended to prevent detection of the perpetrators, as part of a continuous course of criminal conduct.

*Id.* at 342, 185 P.3d at 128. The court also concluded that "the racial motivation applied to all the victims." *Id.*

In light of this evidence, there is not a reasonable probability that the jury would have failed to find the multiple-homicides aggravating factor had it been differently instructed. *See State v. Moore*, 222 Ariz. 1, 17, 213 P.3d 150, 166 (2009) (finding defendant was not prejudiced by incomplete instruction where the evidence "demonstrate[d] a temporal, spatial, and motivational relationship substantial enough that no reasonable jury could fail to find the (F)(8) aggravator beyond a reasonable doubt").

Trial counsel were not ineffective for failing to make futile objections to this instruction. *See James*, 24 F.3d at 27. PCR counsel was not ineffective for failing to raise this claim of ineffective assistance of trial counsel because there was not a reasonable probability that the result of the PCR proceedings would have been different if the claim had been raised.

Claim 14(B)

Boggs argues that trial counsel were ineffective for failing to argue that the multiple-homicides aggravating factor was unconstitutionally vague on its face, failing to argue that "no record evidence supported a clear motivation," and failing to request an instruction that each element of an aggravating factor must be proven beyond a reasonable doubt. (Doc. 15 at 222–24.)

Counsel were not ineffective for failing to mount a facial challenge to § 13–751(F)(8) as unconstitutionally vague. The statute provides that the aggravating factor exists if "[t]he defendant has been convicted of one or more other homicides . . . that were committed during the commission of the offense." A.R.S. § 13–703(F)(8). Although the Arizona Supreme Court has held that the statute is vague on its face, any vagueness is cured where the jury is instructed that the State must prove that the murders took place during a

"continuous course of criminal conduct" and were "temporally, spatially, and motivationally related." *State v. Dann*, 220 Ariz. 351, 364, 207 P.3d 604, 617 (2009).

As noted, the trial court instructed the jury that the murders must have occurred "in close proximity," "within moments" of one another or "during a short, uninterrupted time span," and "for which the defendant had a similar motivation." (RT 5/4/05 at 17–18.) The instruction therefore cured the statute's vagueness. The factor was also supported by the evidence, as affirmed by the Arizona Supreme Court. *Boggs*, 218 Ariz. at 342, 185 P.3d at 128; *see Moore*, 222 Ariz. at 17, 213 P.3d at 166.

Counsel did not perform ineffectively by failing to request a directed verdict or argue to the jury that the (F)(8) aggravator was not supported by sufficient evidence of a motivational relationship between the murders. First, trial counsel did argue to the jury that the murders were not motivationally related, asserting that only Hargrave, not Boggs, had a motive to eliminate witnesses. (RT 5/4/05 at 33–34.) Counsel also argued against a racial motive by challenging the authenticity of the letter allegedly written by Boggs. (*Id.* at 34.) Moreover, as already stated, Boggs suffered no prejudice because no reasonable juror could have failed to find that all three murders were motivationally connected. *Boggs*, 218 Ariz. at 342, 185 P.3d at 128. The Arizona Supreme Court's conclusion that the State proved a motivational relationship beyond a reasonable doubt precludes any finding of prejudice.

Finally, counsel were not ineffective for failing to request that the jurors be instructed that the State must prove each element of an aggravating circumstance beyond a reasonable doubt.

In the aggravation stage of trial, the court instructed the jurors that:

the State must prove beyond a reasonable doubt that one or more of the alleged aggravating factors exist. The burden of proof is on the State on each finding. Each finding must be proved beyond a reasonable doubt.

The general instructions you have already received apply to these findings. (RT 5/4/05 at 14–15.)[10]

---

[10] The court had previously instructed the jurors before their guilt-phase

The court then instructed the jurors on the required findings for the three alleged aggravating factors. (*Id.* at 16–18.)

These instructions adequately explained that each element of an aggravating factor must be proven beyond a reasonable doubt for that factor to be found. The trial court's use of the term "each finding" of the aggravating factor was sufficiently clear, especially considering that the court referred the jurors back to the guilt phase instructions, which explicitly stated that each element of a charge must be proven beyond a reasonable doubt. Counsel therefore did not perform deficiently by failing to request an additional instruction.

Moreover, Boggs cannot demonstrate prejudice because the Arizona Supreme Court found that the multiple-homicides aggravating factor was established beyond a reasonable doubt. *See Boggs*, 218 Ariz. at 340–42, 185 P.3d at 126–28.

Trial counsel were not ineffective for failing to make these challenges to the (F)(8) factor. PCR counsel's failure to raise this claim of ineffective assistance of trial counsel was not ineffective because there was not a reasonable probability that the result of the PCR proceedings would have been different if the claim had been raised.

Conclusion

Because PCR counsel did not perform ineffectively, Boggs fails to establish cause for the default of Claim 14 under *Martinez*. The claim is denied as procedurally barred.

**Claim 16**

Boggs alleges that trial counsel performed ineffectively at sentencing, principally in their presentation of mitigating evidence. (Doc. 15 at 239.) Claim 16 consists of nine subclaims, most of which were never presented in state court.

Boggs argues that the ineffective assistance of PCR counsel excuses the default of the claims he failed to present in state court. The Court finds that *Martinez* does not excuse the default. In doing so, the Court again evaluates the strength of the underlying claim of ineffective assistance of trial counsel. The Court is not faced with an "undeveloped record," which the Ninth Circuit cautioned against in *Ramirez*. *Ramirez*, 937 F.3d at 1242; *see Apelt*

deliberations that "the State must prove each element of each charge beyond a reasonable doubt." (RT 5/2/05 at 101.)

*v. Ryan*, 878 F.3d 800, 824 (9th Cir. 2017). Rather, as discussed below, the record has been expanded to include the materials Boggs offered in support of these claims. It is based on this "properly developed record," *Ramirez*, 927 F.3d at 1242 n.7, that the Court assesses the merits of the underlying ineffective assistance of trial counsel claims.

In addition to finding that the default is not excused, the Court independently finds that the underlying claims are without merit. *See id.* (warning courts not to collapse two-*Martinez* analysis); *cf. Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (explaining that "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing").

<u>Additional facts</u>

Counsel presented three witnesses to testify on Boggs's behalf in the mitigation phase of sentencing. The first was his aunt, Rose Nelson. She testified that her sister, Karen, Boggs's mother, was mentally retarded. (RT 5/10/05 at 10.) She also testified that Boggs had little contact with his father after age five. (*Id.* at 20.)

Boggs was the oldest of three children. His sister died of an epileptic seizure; a few months later his brother, Robert, committed suicide at age 12 by hanging himself from a bunk bed in his room. (*Id.* at 16–17.)

Boggs was born with a cleft palate, requiring surgeries and prolonged hospitalization. (*Id.* at 18.) He was fed through a tube and was unable to gain weight. (*Id.* at 19.) He also suffered from ear infections, which required the insertion of tubes in both ears. (*Id.* at 21.)

Boggs had emotional problems. He was hyperactive and suffered from ADHD. (*Id.* at 22.) He had difficulty in school and was unable to focus. (*Id.*) He engaged in destructive behavior and ran away from home and school. (*Id.* at 25.)

Because of her disability, Boggs's mother did not know how to parent and was "very hard on him." (*Id.* at 23.) She practiced "extreme discipline," forcing Boggs to sit in the corner for hours with his face to the wall. (*Id.* at 23.) She blamed and punished him for everything that went wrong. (*Id.*) He was not allowed to go outside to ride a bike or play with his friends. (*Id.* at 22.)

During this period, from ages five to ten, Boggs received therapy and medication for his hyperactivity and ADHD; he was prescribed Ritalin, which "helped some." (*Id.* at 24–25.) His mother had difficulty following through with Boggs's counseling. (*Id.* at 25.) He was hospitalized at times for his behavioral problems. (*Id.* at 26–27.) Although he engaged in destructive behaviors, he never tried to hurt anyone. (*Id*. at 25.)

From ages 10 to 15, Boggs spent half his time in group homes. (*Id.* at 28.) He was also hospitalized numerous times for his behavioral issues. (*Id.* at 27.) He received counseling but again his mother was unable to provide proper discipline and guidance. (*Id.* at 30.) At around age 13 he told a counselor he was hearing voices. (*Id.* at 28.) He continued to experience problems in school. (*Id.* at 30.)

Boggs's mother died in 1996, and his siblings two years later. (*Id.* at 31.) He was very close to his brother and blamed himself for Robert's suicide because Robert had asked Boggs to spend time with him and Boggs had put him off. (*Id.*)

Boggs's maternal grandparents, with whom he was close, died in 1999. (*Id.*) At age 16 or 17, Boggs began to live with his paternal grandfather. (*Id.* at 33.) Boggs spoke of suicide during this period but never threatened anyone else. (*Id.* at 34.)

On cross-examination, Rose described the household in which Boggs grew up as "normal" with a "happy family" who took "a lot of outings together, vacations together." (*Id.* at 38.) She testified, "we had a good family. We had a good life." (*Id.*) Boggs, until the age of five or six, was a happy, well-adjusted child. (*Id.* at 39.) Karen took Boggs to doctors for his behavior issues and made sure he took his prescribed medication. (*Id.* at 39–40.)

Rose testified that from an early age, Boggs had a problem with authority because he "wanted to control what he was going to do" and "didn't want to be told what to do." (*Id.* at 41–42, 44.) When Boggs's behavior got worse as he got older, his mother continued to seek counseling and professional help for him. (*Id.* at 42.) Rose testified that Boggs did better when he was placed in group homes and institutions due to the structure he received there. (*Id.* at 44–45.)

/ / /

Rose denied that Karen had ever shackled or tied Boggs to his bed. (*Id.* at 43–44.) She did not see Karen beat any of her children. (*Id.* at 46.) Rose was not aware of any mental illness in her family (*Id.* at 45.)

Next, Dr. Ester Ruiz, a psychiatrist, testified on Boggs's behalf. Dr. Ruiz had prepared a "trauma assessment report." She diagnosed Boggs with post-traumatic stress disorder ("PTSD") and bipolar disorder. (*Id.* at 78, 81–82.) She explained that Boggs had "a long history of trauma over many developmental stages," beginning with his birth. (*Id.* at 57.) Boggs was a premature infant. (*Id.*) He was born with a syndrome that left him "deformed," with facial abnormalities and "a small head that required many, many surgeries." (*Id.*) He had a severe cleft palate and "suffered from failure-to-thrive," again leading to many hospitalizations. (*Id.*) He was sexually abused at ages 10 and 14. (*Id.*) He was neglected and physically abused by his mother. (*Id.*)

Boggs experienced seizures and hyperactivity. (*Id.* at 58.) He had periods of disassociation related to his past trauma, experienced auditory hallucinations, and was suicidal at one point. (*Id.* at 59–60.) Dr. Ruiz also testified that Boggs "became rather delusional" when speaking about his militia involvement. (*Id.* at 60.)

On cross-examination, Dr. Ruiz testified that Boggs felt rejected rather than loved by his mother. (*Id.* at 65–66.) She also testified that Boggs's grandmother told her that Karen had chained Boggs to the bed. (*Id.* at 66.) Boggs also reported that his mother once beat him with an extension cord when he was late coming home. (*Id.* at 67–68, 70.)

Finally, Dr. Richard Lanyon, a forensic psychologist, testified that Boggs suffered from long-term bipolar, or manic-depressive, disorder, which manifests in a person having "periods where their behavior is essentially out of control" and other periods "where they are extremely depressed." (*Id.* at 117.) Bipolar disorder has a significant genetic component, and records indicated that at least two of Boggs's relatives likely suffered from the disorder. (*Id.* at 117–18.)

Dr. Lanyon also found that Boggs displayed a number of symptoms consistent with schizophrenia, including delusions and hallucinations. (*Id.* at 123.) He noted that Boggs

had a history of depressive periods and suicide threats or attempts, dating from the age of 10. (*Id.* at 124, 128.) Other symptoms of Boggs's disorders included periods of hearing voices and Boggs's delusions and grandiosity with respect to his militia involvement. (*Id.* at 124–25.)

Dr. Lanyon proceeded to discussed delusions in the context of Boggs's participation in the militia. (*Id.*) He defined delusions as "fixed beliefs held with convictions that are basically false." (*Id.*) Dr. Lanyon characterized the militia as a delusion:

> And as the delusion is built, in his mind he had a large militia of people that he controlled. He had designed fancy uniforms for them, and particular ranks. Each rank there would have specific responsibilities.
> . . .
>
> Sometimes he was able to see that he only had a couple people in this, one of his buddies. And they started humoring him. But other times he believed it was a mark, a very important organization, and it had a very important mission, and he needed to raise money to support it.

(*Id.* at 125–26.) Dr. Lanyon explained that although militias existed, "the difference between a kid with a couple of friends, [and] what he is describing he had, is so great that I consider that to be delusional." (*Id.* at 163.)

Dr. Lanyon testified that Boggs was suffering from bipolar disorder at the time of the crimes. (*Id.* at 131.) He explained, "That doesn't necessarily mean that his behavior on that day was driven by it. That means that his life up to that point . . . was heavily colored by it." (*Id.*) Dr. Lanyon testified that Boggs's bi-polar disorder "significantly dictated his motives, his needs and the thought distortions underlying why he did what he did." (*Id.* at 171.) Dr. Lanyon "raised the question if [Boggs] had not had [bi-polar] disorder, whether he would have been there in the first place." (*Id.* at 175.)

In addition to their testimony, counsel submitted the reports of Drs. Ruiz and Lanyon as exhibits for the jury to review. The reports contain extensive information about Boggs's social history, behavioral issues, and mental health diagnoses.

Dr. Lanyon's report documented the "voluminous" mental health, hospital,

educational, and court records he reviewed, and detailed Boggs's various prior mental health evaluations. (ROA 327, Lanyon Report, at 1–14.) The report described records from Boggs's inpatient psychiatric treatments beginning at the age of 10 and continuing through his hospitalization for seizures at age 23. (*Id.* at 2–14.)

Dr. Lanyon discussed Boggs's birth with Pierre Robin Syndrome and the resulting surgeries. He noted the "chaotic household" in which Boggs was raised. Boggs's mother had a history of suicide attempts and his father had a record of drug dealing, suffered from bi-polar disorder, abused Boggs's mother, and served time in prison for molesting Boggs's sister. (*Id.* at 19.) When Boggs was 16, he and his siblings were placed in the custody of their grandfather, with Karen having "no responsibility for the children." (*Id.* at 10.)

Dr. Lanyon noted that Boggs was hospitalized at age 10 for attempting suicide and threatening to kill his mother, and that he showed symptoms of psychotic disorder. (*Id.* at 20.) From age 10 "though his adolescence, Mr. Boggs spent most of his time in hospitals, residential treatment centers, formal mental health day program care, and juvenile incarceration." (*Id.*) By age 13, professionals recognized that Boggs's problems were "basically psychiatric in nature." (*Id.*) Records showed that several family members had mental illness, including grandparents and siblings, and the illnesses—schizophrenia and bipolar disorder—had a genetic component. (*Id.*)

At age 16, Boggs exhibited "further symptoms of serious mental disorder with paranoid and dangerous implications." (*Id.*) He was expelled from school for an incident involving a gun, stalked an assistant principal, claimed to be the "emperor" of a 20–30 member militia, wrote documents threatening to bomb a court building and a treatment center, signed one of the threats "Emperor Steve," dressed like a "storm trooper" and was supportive of the "Nazi movement," attempted suicide, and "reported hearing voices on a continuous basis." (*Id.* at 20–21.)

Boggs told Dr. Lanyon that he believed his mother molested him at a very young age, that he was molested at age 11 in a group home, that at age 12 he was adjudicated for

having molested his brother and sister, and that he was raped by a police officer at age 15. (*Id.* at 17.)

Dr. Lanyon also reported that the deaths of Boggs's mother, sister, and brother caused him to become "extremely depressed." (*Id.* at 21.)

Dr. Ruiz's report also detailed the difficulties caused by Boggs's birth with Pierre Robin Syndrome. (ROA 327, Ruiz Report at 2.) She reported that Boggs's mother could not deal with his impulsive and hyperactive behaviors. Karen's parenting was abusive. She would "discipline [Boggs] rather severely by beating him with a belt, paddle, or extension cord," place him "in a corner all day" without bathroom breaks, ground him for weeks at a time, and once "chained" him to a bed. (*Id.*)

Dr. Ruiz noted that at the age of 10, when Boggs attempted suicide, he already had a history of setting fires in people's homes, stealing, running away, telling unbelievable stories, behavioral problems in school, temper tantrums, and threats of violence against his mother. (*Id.*) He spent many years in therapy, was diagnosed with "multiple psychiatric disorders," and was treated with a variety of medications. (*Id.*)

Dr. Ruiz also wrote that Boggs felt "rejected" by his mother and had a "nonexistent" relationship with his father. (*Id.* at 3.) His mother accused his father of molesting his sister, but Boggs believed that to be a fabrication. (*Id.*) Boggs felt guilty about his brother's suicide. (*Id.*) Dr. Ruiz also documented that Boggs reported being sexually abused at a group home at age 10 by a 13-year-old resident and sodomized by a police officer at age 14. (*Id.*)

Dr. Eugene Almer, a psychiatrist, evaluated Boggs and testified for the State in rebuttal. (RT 5/11/05.) Dr. Almer diagnosed Boggs with depressive disorder NOS, currently in remission, and borderline, narcissistic, and antisocial personality types. (ROA 327, Almer Report at 12.) He did not find evidence of fetal alcohol syndrome, brain damage, schizophrenia, thinking disorder, or bipolar disorder. (*Id.* at 14.)

During the PCR proceedings, Boggs was evaluated by Dr. Cynthia Boyd, a forensic neuropsychologist. She reported that there were suggestions in the record that Boggs was subjected to toxins *in utero*; his mother drank "rusty water" and "was known to heavily use

alcohol," suggesting the possibility that Boggs suffered from FAS and/or lead poisoning. (Doc. 52-1, Ex. 59 at 2, 13.) Dr. Boyd also determined that Boggs's "cognitive abilities appeared grossly intact and without evidence of brain dysfunction"; "he is not suffering from a major mental disorder" such as schizophrenia or bipolar disorder; and there was "no neurological impairment." (*Id.* at 11–13.)

Claim 16(A)

Boggs alleges that trial counsel performed ineffectively by failing to investigate, develop, and present "a wealth of powerful mitigating evidence." (Doc. 15 at 242.) This claim consists of three subparts. In Claim (16)(A)(1), Boggs alleges that counsel failed to present evidence of "Boggs' upbringing amid a multigenerational history of mental illness, dysfunction, and violence." (*Id.* at 243.) Claim 16(A)(1) is exhausted in part. In Claim 16(A)(2), Boggs alleges that counsel failed to present evidence of Boggs's "family history of instability and neglect" and his "serious physical, mental, emotional, and sexual abuse." (*Id.* at 246.) This claim is unexhausted. In Claim 16(A)(3), Boggs alleges that counsel failed to present evidence of Boggs's mental and cognitive impairments and delusions. (*Id.* at 254.) This claim is also unexhausted.

With respect to the allegations in Claim 16(A), Boggs asserts that the testimony of Rose Nelson presented an "incomplete and misleading" picture of Boggs's history. (Doc. 15 at 248Nevertheless, counsel did present the evidence Boggs alleges was omitted in the testimony and reports of Drs. Lanyon and Ruiz. (*See* Doc. 21 at 193–94.)

a.    *Claim 16(A)(1)*

The aspect of this claim in which Boggs argues that trial counsel performed ineffectively by failing to obtain police reports regarding the deaths of his siblings was adjudicated on the merits in state court. The PCR court denied the claim, finding neither deficient performance nor prejudice:

> Petitioner has neither attached a copy of the police reports nor indicated what relevance they might have, beyond cumulatively confirming that each death occurred. Further, the deaths occurred four years before the murders and— although grief is ongoing—appear unrelated to either a racial- or pecuniary-motive murder.

(Doc. 21, Ex. K, ROA-PCR Item 64 at 6.)

This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

During the mitigation phase of trial, Rose Nelson testified about the deaths and their impact on Boggs. (RT 5/10/05 at 16–17.) The reports of Drs. Lanyon and Ruiz also mentioned the deaths of Boggs's siblings. Dr. Lanyon reported that Boggs felt "considerable guilt" about his brother's suicide and was "extremely depressed" over the deaths of both siblings, believing he could have prevented them. (ROA 327, Lanyon Report, at 15, 21.) Dr. Ruiz also reported that Boggs felt guilt over his brother's suicide. (*Id.*, Ruiz Report, at 3.) In light of this evidence, the state court reasonably concluded that trial counsel did not perform deficiently and Boggs was not prejudiced by counsel's failure to present the information in the police reports.

The remaining, unexhausted component of Claim 16(A)(1) alleges that counsel failed to present evidence of "Boggs' upbringing amid a multigenerational history of mental illness, dysfunction, and violence." (Doc. 15 at 243.) Boggs asserts that "serious red flags should have led counsel to investigate, develop, and present this evidence." (*Id.* at 243–44.) The evidence Boggs refers to, however (*id.* at 243–44), is precisely the evidence that counsel presented in mitigation through the testimony of the witnesses and the experts' reports. This evidence includes the fact that Boggs was born with Pierre Robin syndrome; he suffered physical and emotional abuse by his mother; he was subject to out-of-home placements and juvenile adjudications; his homelife was chaotic and his mother was poorly equipped to raise him; he attempted suicide and was hospitalized; he was affected by deaths in the family; and his family had a history of mental illness.

Counsel presented the very evidence on which this allegation of ineffective assistance is premised. Boggs cannot show that counsel performed deficiently or that he was prejudiced by the omission of such evidence. *See Greenway v. Schriro*, 653 F.3d 790, 804 (9th Cir. 2011) (finding petitioner not entitled to relief on ineffective assistance of

counsel claim where he has not "alleged, much less demonstrated, what more counsel should have known or discovered").

    *b.    Claim 16(A)(2)*

Boggs alleges that counsel performed ineffectively by failing to present evidence of his "family history of instability and neglect, and the serious physical, mental, emotional, and sexual abuse he endured." (Doc. 15 at 246.) He contends that "the real story of Boggs's history shows that the picture painted by Rose was incomplete and misleading." (*Id.* at 248.) According to Boggs, counsel failed to "present even a shadow of the story of his childhood, in which Boggs bounced around from unstable home, to runaway, to mental or juvenile institution—subject to sexual, physical, and emotional abuse." (*Id.* at 254.)

Boggs focuses on inconsistencies between the testimony of Rose Nelson and records demonstrating the abuse, neglect, and mental illness "that characterized Boggs's childhood." (Doc. 15 at 253.) Again, however, the information Boggs cites for the "real story of Boggs's history" (*id*. at 248) is contained in the testimony and reports of Drs. Lanyon and Ruiz (*id.* at 248–53).

Boggs cites Dr. Lanyon's report for evidence about Boggs's chaotic homelife, including information that Boggs's mother was an alcoholic who spent much of her time on the streets or in the park near the family home and was slow in her thinking. (ROA 327, Lanyon Report at 8, 19; *see* ROA 327, Ruiz Report at 5.) He cites Dr. Lanyon's report for information that Boggs's mother attempted suicide while she was pregnant with Boggs. (ROA 327, Lanyon Report at 3.) He relies on Dr. Lanyon's report for evidence that the Boggs family was dysfunctional, that they kept family secrets and chose to ignore the abuse going on in their home. (*Id.* at 8.) He cites the report for evidence that Boggs's father was arrested and charged with sexually abusing his daughter. (*Id.* at 2.)

Dr. Lanyon's report contained a comprehensive history of Boggs's behavioral problems, mental health diagnoses, and out-of-home placements. (*Id.* at 1–14.) Dr. Lanyon noted that Boggs, throughout his adolescence, spent most of his time institutionalized in hospitals, treatment centers, mental health day programs, and juvenile incarceration. (*Id.* at

20.)

The experts' reports also detailed the "physical, mental, emotional, and sexual abuse" Boggs suffered. Dr. Ruiz reported that Boggs's mother used harsh disciplinary methods, including beating him, forcing him to sit in a corner all day, and chaining him to the bed. (ROA 327, Ruiz Report at 2.) She also noted that Boggs felt "rejected" by his mother and had no relationship with his father. (*Id.* at 3.) Both Dr. Lanyon and Dr. Ruiz related Boggs's allegations that he was sexually abused as a child. (*Id.*; ROA 327, Lanyon Report at 17.)

Dr. Lanyon's report detailed Boggs's behavioral problems and his history of delusional and grandiose thoughts. (ROA 327, Lanyon Report at 19–21.) Dr. Lanyon noted that Boggs was expelled from school for an incident involving a gun, stalked an assistant principal, wrote threatening letters, claimed to be the "emperor" of a militia, and dressed like a Star Wars "storm trooper." (*Id.* at 21.) Although this information was not conveyed through the testimony of Rose Nelson (*see* Doc. 15 at 252), it was before the jury.

In fact, as Respondents note, Boggs offers only two citations to information regarding his childhood that was not contained in the evidence presented to the jury. He refers to Child Protective Services (CPS) reports stating that his sister Diane had intellectual disabilities for which she was treated in special education programs and CPS "reports against Karen and Boggs's grandfather, Bob Baumgartner, regarding Boggs and his siblings." (Doc. 15 at 249, 250.) This information is of little mitigating value compared to the information that was provided to the jury. To the extent the CPS reports regarding Boggs's mother may have revealed abuse or neglect, counsel presented such information through Rose Nelson and Drs. Lanyon and Ruiz. (*See, e.g.*, R.T. 5/10/05 at 22–23, 25, 29, 46, 56–57; ROA Item 327, Lanyon Report at 10, Ruiz Report at 2–3.)

Boggs faults counsel for relying on a single lay witness and not calling "any former teachers, neighbors, friends, employees from the various treatment and juvenile centers, or numerous other individuals that could have offered insight into Boggs's life." (Doc. 15 at 246–47.) He does not identify what mitigating information these unnamed witnesses would

have revealed beyond what counsel presented at sentencing. *See Greenway*, 653 F.3d at 804.

### c. Claim 16(A)(3)

Boggs alleges that counsel failed to investigate, develop, or present evidence about the sources, effects, and manifestations of his serious mental and cognitive impairments" and to "investigate the delusions that permeated Boggs's history, as well as the crime, that were a direct result of his serious mental illnesses." (Doc. 15 at 254.)

Boggs lists six circumstances showing the "mental and cognitive impairments and delusions that were part of his history and present at the time of the crime" and alleges that trial counsel did not investigate them or gather supporting records. (Doc. 15 at 254–55.) In support of these circumstances, however, he cites Dr. Lanyon's report, which was provided to the jury. (*Id.*) Dr. Lanyon also testified about Boggs's delusional beliefs. (RT 5/10/05 at 125–26, 161–62.)

Boggs identifies no additional evidence that counsel should have presented. *See Greenway*, 753 F.3d at 804. Counsel did not perform ineffectively with respect to this evidence.

### d. Conclusion

With respect to the exhausted portion of Claim 16(A)(1), the claim is denied on the merits. With respect to the procedurally defaulted aspects of Claim 16(A)(1), and Claims 16(A)(2) and (3), the Court finds that PCR counsel did not perform ineffectively in failing to raise the claims and there was not a reasonable probability, based on the weakness of the underlying ineffective assistance of counsel claims, that the result of the PCR proceedings would have been different if counsel had raised them. *See Ramirez*, 937 F.3d at 1241; *Clabourne*, 745 F.3d at 377. Those portions of Claim 16(A) therefore remain defaulted and barred from federal review. Even if the default were excused, the claims are meritless under *Strickland*. Claim 16(A) is denied.

/ / /

/ / /

<u>Claim 16(B)</u>

Boggs alleges that trial counsel performed ineffectively by failing to subpoena certain witnesses and failing to adequately prepare others in the mitigation phase of trial. (Doc. 15 at 258.)

This claim fails because Boggs does not identify what witnesses should have been called and what their testimony would have been. *See United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir. 1985) (finding no ineffective assistance based on the failure to call witnesses when the defendant failed to identify any witness his counsel should have called who would have been helpful); *see also Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.), *amended by* 253 F.3d 1150 (9th Cir. 2001) (explaining that petitioner's mere speculation that a witness might have given helpful information is not enough to establish ineffective assistance); *Dows v. Woods*, 211 F.3d 480, 486 (9th Cir. 2000) ("Dows provides no evidence that this witness would have provided helpful testimony for the defense . . . .").

Boggs contends that counsel inadequately prepared their experts. According to Boggs, counsel did not interview "numerous people in Boggs's life, including caregivers, friends, and teachers," failed to "elicit information about cognitive deficits or other serious neurological issues," failed to conduct "adaptive-behavior interviews," and failed to conduct a "multi-generational investigation." (Doc. 15 at 271–72.) He also asserts that counsel "failed to follow up on the leads provided by prior counsel and the records prior counsel gathered in the case." (*Id.* at 272.) These conclusory allegations fail to establish ineffective assistance of counsel. Boggs does not identify anyone counsel should have spoken to or specify what facts counsel should have discovered and presented. Boggs similarly fails to identify which leads and records counsel failed to pursue.

Boggs also alleges that his experts, Drs. Lanyon and Ruiz, "were not adequately prepared to testify about the Imperial Royal Guard because they lacked factual support to bolster their beliefs that the militia talk seemed delusional." (Doc. 15 at 272.) This claim is meritless because the facts about the militia were before the jury. Boggs's beliefs about the militia could be characterized as delusional or grandiose as they were by Drs. Lanyon

and Ruiz. Yet, the Petitioner was part of a small group that was armed and that committed the murders. Petitioner fails to explain how additional preparation of the experts would have changed that evidence.

PCR counsel was not ineffective for failing to raise this claim. There was not a reasonable probability that the result of the PCR proceedings would have been different if the claim had been raised. Claim 16(B) therefore remains defaulted and barred from federal review. Even if the default were excused, the claim is meritless under *Strickland*.

Claim 16(B) is denied.

Claim 16(C)

Boggs alleges that trial counsel performed ineffectively by failing to investigate whether Boggs suffers from Fetal Alcohol Spectrum Disorder (FASD).[11] (Doc. 15 at 274.) According to Boggs, trial counsel "complete[ly] fail[ed] to pursue evidence of Boggs's exposure to drugs and alcohol *in utero* and to seek expert advice on the intellectual, neurological, and neuropsychological effects of that exposure on Boggs." (*Id.* at 278.) Boggs asserts he has characteristics of FASD that trial counsel should have been aware of, including ADHD, learning disabilities, speech and language disorders, oppositional-defiant disorders, and self-injurious disorders. (*Id.*)

The record showed that Boggs's mother had a drinking problem and died of liver cancer. (ROA 327, Almer Report at 4; ROA 327 at Ruiz Report at 2.) Defense expert Dr. Mark Walter performed a neuropsychological examination of Boggs in April 2004, prior to trial. (Doc. 25-4, Ex. EE.) He evaluated Boggs's "neurocognitive functioning in the light of a history of a seizure disorder, probable ADHD, possible Fetal Alcohol Syndrome (FAS) versus Fetal Alcohol Effect (FAE), among other neuropsychiatric disorders." (*Id.* at 1.) Dr. Walter noted impairment in Boggs's adaptive executive functioning that was "consistent with his history of attention deficit and indicates the presence of brain damage, specifically in frontal lobe functioning." (*Id.* at 9.) He opined that these symptoms could

---

[11] Boggs has withdrawn his allegation that counsel performed ineffectively by failing to investigate whether Boggs was intellectually disabled. (Doc. 26 at 109.)

be caused by uncontrolled seizures; they "could also stem from an FAE (Fetal Alcohol Effect) rather than full FAS." (*Id.*)

As noted above, during the PCR proceedings Dr. Boyd evaluated Boggs and suggested that he may have suffered from FAS. (Doc. 52-1, Ex. 59 at 2, 13.)

The Court previously expanded the record to include the evidence Boggs offered in support of this claim. (*See* Doc. 67.) The new evidence includes a 2017 report by Dr. Julian Davies, who concludes that Boggs suffers from "Neurobehavioral Disorder/Alcohol Exposed, a Fetal Alcohol Spectrum Disorder." (Doc. 51-9, Ex. 54 at 31.) This condition is characterized by moderate dysfunction due to congenital brain damage associated with prenatal alcohol exposure. (*Id.* at 32.) Dr. Davies acknowledges that "[d]ocumentation around [Boggs's] prenatal alcohol exposure history is somewhat inconsistent" but opines that "the third trimester exposure to ethanol (drips for preterm labor) is non-controversial, and that earlier drinking during pregnancy is very likely." (*Id.* at 25–26.)

The expanded record also includes Dr. Kenneth Benedict's 2017 report, which states "[t]here is evidence that [Boggs] was exposed in utero to alcohol, and he may quite likely suffer from a Fetal Alcohol Spectrum Disorder." (Doc. 51-9, Ex. 53 at 23.)

In a 2016 declaration, Dr. George DeLong, a psychologist who had examined Boggs prior to trial in 2002, criticizes Dr. Almer's conclusion that Boggs did not suffer from FAS. (Doc. 52, Ex. 55 at 3–8.) Dr. Lanyon provided an affidavit in 2016 citing "newly available information" reporting that when Boggs was born the doctor informed Boggs's father that Boggs had fetal alcohol syndrome. (Doc. 52-1, Ex. 56 at 5.) Dr. Peter Simi, a sociologist and criminologist, writes in the background section of his 2017 report that Boggs's mother was an alcoholic who "reportedly consumed large quantities of alcohol throughout her pregnancy and there is some indication from discovery documents that [Boggs] may have suffered from fetal alcohol syndrome." (*Id.*, Ex. 57 at 5.)

The expanded record also includes lay declarations from family members who recount alcohol consumption by Boggs's mother. Steve Boggs Sr. states that his wife was

an alcoholic and drank when she was pregnant with Boggs and that when Boggs was born the doctor told him that Boggs had FAS. (Doc. 52-7, Ex. 79 at 3.) Rose Nelson, Karen Boggs's sister, states that Karen drank "socially" when she was pregnant with Boggs. (*Id.*, Ex. 80 at 3.)

Despite this new information, the Court finds that trial counsel did not perform ineffectively with respect to the issue of FASD or related conditions. With the exception of Dr. Walter, none of the experts who evaluated Boggs prior to trial opined that he suffered from fetal alcohol syndrome, including the experts whom counsel chose to testify on Boggs's behalf at sentencing, Drs. Lanyon and Ruiz. The failure of Boggs's experts to diagnose him with fetal alcohol syndrome "does not constitute ineffective assistance of *counsel*, and [a petitioner] has no constitutional guarantee of effective assistance of experts." *Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010).

More importantly, it is "strongly presumed" that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005). Boggs has not overcome the presumption that trial counsel made a reasonable strategic decision to present the opinions of Drs. Lanyon and Ruiz, who diagnosed Boggs with PTSD and bipolar disorder, rather than Dr. Walter's opinion that Boggs might have had FAE. Counsel are entitled to this presumption because, contrary to Boggs's assertion, their investigation encompassed the question of whether Boggs suffered from the effects of *in utero* exposure to alcohol.

As the Supreme Court explained in *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. "Because of the difficulties inherent in fairly evaluating counsel's performance, courts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 988 (9th Cir. 2013) (quoting *Strickland*, 466 U.S. at 689). "This presumption of reasonableness means that not only do we 'give the attorneys the benefit of the doubt,' we must also 'affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did.'" *Id.*

(quoting *Pinholster*, 563 U.S. at 196) (additional citations omitted); *see also Leavitt v. Arave*, 646 F.3d 605, 609 (9th Cir. 2011).

As described above, trial counsel presented extensive evidence about Boggs's social history and mental health issues. Counsel focused on the diagnoses of bipolar disorder and PTSD, but the record included numerous diagnoses rendered by mental health professionals who had treated Boggs throughout his life. Counsel's failure to add a diagnosis of FAE or FASD to this evidence did not constitute deficient performance, particularly because Boggs does not draw a connection between those conditions and his conduct during the crimes. *See State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (noting that while a causal connection is not required for mitigating evidence to be considered, "the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence"). This contrasts with the mitigation testimony of Dr. Lanyon, who drew connections between Boggs's bipolar disorder and his behavior in committing the murders. (*See* RT 5/10/05 at 131, 171, 175.)

Even if counsel performed deficiently in failing to pursue evidence of FASD, Boggs cannot show he was prejudiced given the mitigating evidence that was presented and the strength of the aggravating factors. The jury found three aggravating factors, one of which, the multiple-homicides aggravator, carries "extraordinary weight" in the sentencing calculus. *State v. Hampton*, 213 Ariz. 167, 185,140 P.3d 950, 968 (2006). There was not a reasonable probability that the jury would have reached a different sentence if counsel had presented evidence that Boggs suffered from FASD in addition to the social history and mental health information they did present.

In *Landrigan*, 550 U.S. at 480–81, the Supreme Court held the petitioner was not prejudiced by counsel's failure to present mitigating evidence indicating that the petitioner suffered from fetal alcohol syndrome, was abandoned by his birth mother, was raised by an alcoholic adoptive mother, began abusing alcohol and drugs at an early age, and had a genetic predisposition to violence. The Court described the evidence as "poor quality" and therefore not supportive of a colorable claim of ineffective assistance of counsel. *Id.*; *see Rhoades v. Henry*, 638 F.3d 1027, 1052 (9th Cir. 2010) (holding "that [petitioner's] newly

proffered facts . . . add too little, and the aggravating circumstances are too strong, to make it reasonably probable that the sentencing decision would have been different but for counsel's performance").

Counsel did not perform ineffectively by failing to present evidence that Boggs suffered from FASD. PCR counsel was not ineffective for failing to raise this claim. There was not a reasonable probability that the result of the PCR proceedings would have been different if counsel had raised the claim. Claim 16(C) therefore remains defaulted and barred from federal review. Even if the default were excused, the claim is meritless under *Strickland*.

Claim 16(C) is denied.

<u>Claim 16(D)</u>

Boggs alleges that counsel performed ineffectively by failing to argue that his lack of a prior criminal record was a mitigating circumstance. (Doc. 15 at 280.) The PCR court rejected this claim:

> Petitioner mischaracterizes his past. Evidence was presented that when Petitioner was about eleven he was placed on juvenile probation, indicating that he may have been adjudicated delinquent. See May 10, 2005 R.T., at 35. Had counsel claimed that Petitioner lacked a criminal record, the State might have been permitted further inquiry into the juvenile matter, to Petitioner's detriment (not only for the underlying facts of the adjudication itself but also as to the fact of the adjudication, which might show that Petitioner had attempted to mislead the jury). Such would likely have resulted in prejudice at the mitigation phase.

> Based on the foregoing, the Court finds that Petitioner has failed to raise a colorable claim for relief and to establish either deficient performance or prejudice.

(Doc. 21, Ex. K, ROA-PCR Item 64 at 6.)

This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

Boggs criticizes the PCR court's decision, arguing that juveniles are "adjudicated, not convicted," that his juvenile record had already been placed into the record, and that his juvenile record was mitigating rather than aggravating. (Doc. 15 at 282.)

Applying the "doubly deferential" standard of *Strickland* and § 2254(d), *Richter*, 562 U.S. at 105, the PCR court's decision does not entitle Boggs to relief. Respondents detail Boggs's juvenile record. (Doc. 21 at 205–06.) As the PCR court noted, if counsel had argued that Boggs's lack of an adult criminal record was mitigating, the State could have countered with the details of Boggs's extensive juvenile record.

In addition, as the PCR court found, Boggs was not prejudiced by counsel's failure to argue that his lack of an adult criminal record was mitigating. "[A] defendant's lack of a prior felony conviction 'is a mitigating circumstance, but entitled to little weight.'" *State v. Gomez*, 231 Ariz. 219, 227, 293 P.3d 495, 503 (2012) (quoting *State v. Greene*, 192 Ariz. 431, 442, 967 P.2d 106, 117 (1998)).

As a relatively weak mitigating circumstance, Boggs's lack of a criminal record would have been balanced against three aggravating factors, including the multiple-homicides aggravating factor which carries extraordinary weight. *Boggs*, 218 Ariz. at 344, 185 P.3d at 130. There was not a reasonable probability that adding this mitigating circumstance would have led to a different sentence.

Claim 16(D) is denied.

Claim 16(E)

Boggs alleges that counsel performed ineffectively by failing to establish a nexus between the mitigation evidence and the offense. (Doc. 15 at 283.) The PCR court denied this claim:

> At the penalty phase, neither of Petitioner's experts could testify to his mental state at the time of the murders (May 10, 2005 R.T. at 87 (Dr. Ruiz); 168-69 (Dr. Lanyon)), or that he did not know right from wrong. In its independent review, the Supreme Court accorded less weight to Petitioner's mitigation evidence of his difficult upbringing and poor mental health due to its lack of a causal link to the murders. *Boggs*, 218 Ariz. at 340, 185 P.3d at 126.
>
> Although Petitioner now claims ineffective assistance because trial counsel failed to establish this causal link, he provides no affidavits or any other evidence suggesting how counsel could have established such a connection. The Court is not required to conduct an evidentiary hearing based on mere

generalizations and unsubstantiated claims of ineffective assistance. *State v. Borbon*, 146 Ariz. 392, 706 P.2d 718 (1985).

Based on the foregoing, the Court finds that Petitioner has failed to raise a colorable claim for relief and to establish either deficient performance or prejudice.

(Doc. 21, Ex. K, ROA-PCR Item 64 at 9.)

This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable interpretation of the facts.

First, Boggs offers only conclusory assertions that trial counsel could have drawn a causal connection between the mitigation evidence and Boggs's crimes. (*See* Doc. 15 at 284–85.) Moreover, as already noted, counsel did present, through the testimony of Dr. Lanyon, evidence that Boggs's conduct at the time of the crimes was influenced by his bipolar condition. (*See* RT 5/10/05 at 131, 171, 175.) Under the "doubly deferential" standard of *Strickland* and § 2254(d), *Richter*, 562 U.S. at 105, the PCR court's decision does not entitle Boggs to relief.

Claim 16(E) is denied.

Claim 16(F)

In this defaulted claim, Boggs alleges that counsel performed ineffectively by failing to object to the prosecutor's causal nexus argument.[12] (Doc. 15 at 285.)

The State attacked the mitigation evidence presented by Boggs, arguing that it was not supported by the evidence. (*See* RT 5/12/05 at 32–35.) Specifically, with respect to Boggs's bipolar diagnosis, the prosecutor contended "there is nothing that has been introduced in this courtroom that tells you that anything that happened on May 19th had

---

[12] In *Eddings v. Oklahoma*, 455 U.S. 104, 113–15 (1982), the Supreme Court held that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as *a matter of law,* any relevant mitigating evidence. . . . The sentencer . . . may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." In *Tennard*, the Supreme Court rejected a "nexus" test under which mitigating evidence was relevant only when it bore a causal nexus to the crime. 542 U.S. at 287.

anything to do with a bipolar disorder. There was no manic state. There was no spontaneous, zooming, go fast mentality. This was a crime that was planned and carried out. Three people murdered for money and then covered up." (RT 5/12/05 at 33.)

According to Boggs, these comments constituted prosecutorial misconduct by misrepresenting the law regarding mitigation, and counsel performed ineffectively by failing to object. (Doc. 15 at 286.)

The prosecutor, however, did not commit misconduct. Although the prosecutor argued that the condition was not connected to Boggs's actions at the time of the crimes, he did not suggest that the jury was precluded from considering Boggs's bipolar condition or any other mitigating evidence. Instead, the prosecutor was making a permissible argument about the weight of the mitigating evidence. *See State v. Pandeli*, 215 Ariz. 514, 525–26, 161 P.3d 557, 568–69 (2007) (explaining that prosecutor may properly argue that mitigating evidence is not particularly relevant or is entitled to little weight because it is unconnected to crime). This argument is consistent with Supreme Court precedent holding that the sentencer is free to determine the weight to be ascribed to mitigating evidence. *See Harris v. Alabama*, 513 U.S. 504, 512 (1995) ("[T]he Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer."); *see also Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998) (explaining that a sentencer may not be precluded from considering relevant mitigation, but "is free to assess how much weight to assign to such evidence"), *overruling on other grounds recognized by Apelt v. Ryan*, 878 F.3d 800, 827 (9th Cir. 2017).

Because the prosecutor's argument was not improper, trial counsel did not perform ineffectively by failing to object. *See James*, 24 F.3d at 27. PCR counsel was not ineffective for failing to raise this claim of ineffective assistance of trial counsel. There was not a reasonable probability that the result of the PCR proceedings would have been different if counsel had raised the claim. Claim 16(F) therefore remains defaulted and barred from federal review.

/ / /

<u>Claim 16(G)</u>

In this defaulted claim, Boggs alleges that counsel performed ineffectively by failing to object to the jury instruction on mitigation. (Doc. 15 at 287.) The court instructed the jury as follows:

> Mitigation in this case has been offered. Your decision now is whether that mitigation actually exists. And the defense has to prove it to you by a preponderance of the evidence but they have to prove it to you. Whether the defense has proven it and only if proven, whether it is sufficiently substantial to call for leniency, these are your considerations.

(RT 5/12/05 at 28.)

The jury instruction was correct under Arizona law and constitutionally permissible. As noted above, the Supreme Court has held that requiring capital defendants to prove mitigating circumstances by a preponderance of the evidence is constitutional. *Walton*, 497 U.S. at 649–51 (1990); *see also Marsh*, 548 U.S. at 173. Counsel was not ineffective for failing to raise a meritless objection. *See Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000); *Boag*, 769 F.2d at 1344.

PCR counsel was not ineffective for failing to allege ineffective assistance of trial counsel. There was not a reasonable probability that the result of the PCR proceedings would have been different if counsel had raised the claim. Claim 16(G) therefore remains defaulted and barred from federal review.

<u>Claim 16(H)</u>

Boggs alleges that counsel performed ineffectively by failing to adequately challenge the rebuttal testimony. (Doc. 15 at 288.) The PCR court denied this claim, finding that it was both precluded and that Boggs failed to establish deficient performance or prejudice because the Arizona Supreme Court resolved the admissibility of the evidence on direct appeal. (Ex. K, ROA-PCR Item 64, at 9.)

The Arizona Supreme Court noted that counsel failed to object to Boggs's letters on foundational grounds. As Respondents explain, however, the court rejected as "not

persuasive" his argument on appeal that the letters were unreliable because there was insufficient proof he wrote them:

> First, nearly identical letters were sent to the lead detective and to the prosecutor. Second, Boggs' militia title was "Chief of Staff," and the letters specifically referred to the "Chief." Third, jail staff intercepted one of the letters, which an inmate stated that Boggs had asked him to mail. Finally, the letters stated, "we know where you live," and Boggs possessed an address for Vogel. The introduction of the threatening letters at the penalty phase did not violate Boggs' due process rights.

*Boggs*, 218 Ariz. at 340, 185 P.3d at 126.

Given the Arizona Supreme Court's conclusion that reliable evidence established that Boggs wrote the letters, it was reasonable for the PCR court to find that counsel did not perform ineffectively by failing to raise a foundational challenge. Claim 16(H) is denied.

Claim 16(I)

Boggs alleges that counsel performed ineffectively by failing to ensure that their representation did not cumulatively prejudice Boggs. (Doc 15 at 291.) The PCR court rejected this claim:

> As set forth above, the Court has considered each of Petitioner's ineffective assistance claims and found no colorable claims. As counsel's performance was not deficient, Petitioner cannot show that absent these alleged deficiencies, the outcome of his trial might have been different. Accordingly, the Court finds that this claim also is not colorable.

(Ex. K, ROA-PCR Item 64, at 10.)

This decision was neither contrary to nor an unreasonable application of clearly established federal law.

As previously noted, the United States Supreme Court has not specifically recognized the doctrine of cumulative error as an independent basis for habeas relief. Therefore, the PCR court's denial of this claim was not contrary to clearly established federal law under § 2254(d)(1). In addition, "[b]ecause there is no single constitutional

error in this case, there is nothing to accumulate to the level of a constitutional violation." *Mancuso*, 292 F.3d at 957. Claim 16(I) is denied.

Conclusion

Boggs has not met his burden under *Strickland* of proving that trial counsel's performance at the penalty phase of trial was deficient or prejudicial. With respect to the exhausted claims, Boggs fails to meet the doubly deferential standard under the AEDPA. With respect to the defaulted claims, Boggs has not established cause under *Martinez* because he has not shown that PCR counsel's performance was ineffective. Accordingly, Claim 16 is denied.

**Claim 20**

Boggs alleges numerous claims of ineffective assistance of appellate counsel. (Doc. 15 at 313.) Boggs did not raise these claims in state court, but Respondents concede that two of the claims were exhausted when the PCR court addressed the underlying issues in its order denying relief. Those issues were the trial court's failure to record bench conferences and the trial court's failure to hold a pretrial Rule 404(b) hearing.

The remaining claims of ineffective assistance of appellate counsel are unexhausted.[13] Because *Martinez* does not apply to excuse the default of claims of ineffective assistance of appellate counsel, *Davila*, 137 S. Ct. at 2062–63, the claims are procedurally defaulted and barred from federal review.

The PCR court's rejection of the exhausted claims was neither contrary to nor an unreasonable application of clearly established federal law.

Ineffective assistance of appellate counsel claims are evaluated under the *Strickland* standard. *See Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). First, Boggs must show that appellate counsel's

---

[13] The unexhausted claims are as follows: failure to raise issues regarding Boggs's competency; failure to challenge Boggs's shackling; failure to object to crime scene and autopsy photos; failure to challenge jury instructions; and failure to raise claims of prosecutorial misconduct. (Doc. 15 at 313–25.)

performance was objectively unreasonable, which requires him to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Id.* Second, he must show prejudice, which means he must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, he would have prevailed in his appeal. *Id.* "[F]ailure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal." *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (citing *Jones*, 231 F.3d at 1239 n.8).

Boggs alleges that appellate counsel performed ineffectively by failing to challenge the admission of evidence of his militia involvement under Rule 404(b) of the Arizona Rules of Criminal Procedure. (Doc. 15 at 318.) The PCR court rejected this claim, concluding that the militia evidence was admissible and therefore appellate counsel did not perform ineffectively in failing to challenge it. (Doc. 21, Ex. K, ROA-PCR Item 64 at 13.) The court noted that the Arizona Supreme Court held the evidence admissible in *Hargrave*, 225 Ariz. at 8–9, 234 P.3d at 576–77. (*Id.*)

Boggs also alleges that appellate counsel was ineffective for not challenging the trial court's failure to maintain a complete record. (Doc. 15 at 320.) The PCR court rejected this claim on its merits, finding that appellate counsel was not ineffective because the claim would have been rejected on direct appeal. (Doc. 21, Ex. K, ROA-PCR Item 64 at 12–13.) The court explained that Boggs did not object to the unrecorded conferences and there was no indication he was prejudiced. (*Id.*)

The PCR court's decisions do not satisfy § 2254(d). It would have been futile for counsel to challenge the admissibility of the militia evidence on direct appeal to the Arizona Supreme Court because in Hargrave's case the court ruled that the same information was admissible as evidence of motive and that its probative value was not substantially outweighed by the prejudice it might cause. *Hargrave*, 225 Ariz. at 8–9, 234 P.3d at 576–77.

The Arizona Supreme Court has also held that "[a] defendant who does not object to proceeding [with bench conferences] without a reporter . . . waives his right to complain

that the proceedings were not recorded." *Dann*, 220 Ariz. at 370, 207 P.3d at 623. Boggs did not object at trial, so an appellate claim raising the issue would have been futile. Moreover, as the PCR court found, Boggs did not establish that he was prejudiced by the unrecorded conferences.

The exhausted aspects of Claim 20 are meritless. The remaining allegations are procedurally defaulted and barred from federal review. Claim 20 is denied.

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claims 3, alleging a denial of the Petitioner's right of self-representation, and 16(A)  16(C) and 16(E), alleging ineffective assistance of counsel at sentencing for failure to investigate and present mitigating evidence.

/ / /

/ / /

/ / /

**V. CONCLUSION**

Based on the foregoing,

**IT IS HEREBY ORDERED** that Boggs's Petition for Writ of Habeas Corpus (Doc. 15) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** granting a certificate of appealability with respect to Claims 3, 16(A) 16(C) and 16(E).

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

Dated this 27th day of March, 2020.

G. Murray Snow
Chief United States District Judge